(76 South. 505)

## LOUISVILLE & N. R. CO. v. STATE.
### (6 Div. 224.)

(Court of Appeals of Alabama. May 29, 1917. Rehearing Denied June 30, 1917.)

1. COMMERCE ⟨⟩8(1) — STATE LAW — CONFLICT WITH FEDERAL LAW.

In determining whether a federal statute has superseded a state enactment, the entire scope and purpose of the federal statute must be considered, and that which needs to be implied within its statutory scope and intent is of no less force than that which is expressed in the act; and if the federal statute, when so considered, will be frustrated in its chosen field of operation, and its provisions refused their natural effect, the state law must yield to the superior authority of the federal law within the sphere of its delegated and assumed authority. [Response of Supreme Court to certified question.]

2. COMMERCE ⟨⟩8(1)—STATE LAW—CONFLICT WITH FEDERAL ACT.

The congressional intent to supersede by a federal act the exercise by the state of its police powers as to matters not covered by federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe and occupy a limited field. [Response of Supreme Court to certified question.]

3. COMMERCE ⟨⟩8(1)—STATE LAW—CONFLICT WITH FEDERAL LAW.

To supersede a state enactment on the same subject, an act of Congress, fairly interpreted, must actually conflict with the state law. [Response of Supreme Court to certified question.]

4. COMMERCE ⟨⟩8(4)—INTERSTATE COMMERCE — SUPERSESSION OF STATE BY FEDERAL ENACTMENT.

Locomotive Headlight Law (Acts 1915, p. 257) has no application to engines engaged in interstate commerce; the federal Safe Locomotive Boilers Act Feb. 17, 1911 (Act Cong. Feb. 17, 1911, c. 103, 36 Stat. 913), as amended by Act March 4, 1915, c. 169, 38 Stat. 1192 (U. S. Comp. St. 1916, §§ 8639a–8639d), having excluded the states from the right to legislate on the matter of interstate locomotive equipment, though the final federal rules on the subject of headlights on interstate locomotives were not promulgated by the Interstate Commerce Commission until after a railroad charged with violating the Locomotive Headlight Law of the state committed the offense. [Response of Supreme Court to certified question.]

5. STATUTES ⟨⟩47—DEFINITENESS.

Locomotive Headlight Law (Acts 1915, p. 257) is not invalid as indefinite. [Response of Supreme Court to certified question.]

6. STATUTES ⟨⟩113(3)—TITLE.

Locomotive Headlight Law (Acts 1915, p. 257), entitled "An act relating to the safety of employés and other persons on railroads, by providing for power headlights on all engines operated in road service in the nighttime," is not violative of Const. 1901, § 45, providing that each law shall contain but one subject, which shall be clearly expressed in its title, etc. [Response by Supreme Court to certified question.]

Appeal from Criminal Court, Jefferson County; H. P. Heflin, Judge.

The Louisville & Nashville Railroad Company was convicted of violating the Locomotive Headlight Law, and it appealed to the Court of Appeals, which certifies the question of the validity of the statute to the Supreme Court. Opinion of Supreme Court certified to Court of Appeals in answer to question.

H. L. Stone and W. A. Colston, both of Louisville, Ky., Tillman, Bradley & Morrow, of Birmingham, and Jones, Thomas & Field, of Montgomery, for appellant. W. L. Martin, Atty. Gen., and P. W. Turner, Asst. Atty. Gen., for the State.

### Certification to the Supreme Court.

The undersigned, judges of the Court of Appeals, in the above-entitled cause being of the opinion that the act of the Legislature of Alabama approved July 17, 1915, entitled "An act relating to the safety of employés and other persons on railroads, by providing for power headlights on all engines operated in road service in the nighttime, with a penalty for a violation thereof. Section 1. Locomotives to be equipped with power headlights—power of same—Exceptions. 2. Penalty. 3. Violation—Duty of circuit courts. 4. Act to take effect when." (Acts 1915, p. 257)—is invalid and inoperative, hereby certify that question to the Supreme Court of the state of Alabama for its determination, as by law in such cases made and provided. Act approved April 18, 1911, 1 Ala. App. pp. 10, 11. This question is certified as an abstract question as by law required; the record in the case and our opinion, giving the reasons leading us to that conclusion, being submitted herewith for the convenience of the Supreme Court.

JOHN PELHAM,
Presiding Judge.
J. B. BROWN,
CHARLES R. BRICKEN,
Associate Judges.

PELHAM, P. J. Defendant was convicted under an indictment returned March 17, 1916, charging a violation of an act of the Legislature entitled "An act relating to the safety of employés and other persons on railroads, by providing for power headlights on all engines operated in road service in the nighttime, with a penalty for the violation thereof," approved July 17, 1915, and commonly called the "Locomotive Headlight Law." General Acts 1915, p. 257. By the provisions of that law, all companies, etc., operating railroads (with certain exceptions), were required to equip, maintain, and use upon every locomotive, operated in road service in the state in the nighttime, a power headlight of not less than 1,500 candle power brilliancy, measured with the aid of a suitable reflector, etc.; 25 per cent. of such locomotives to be equipped within six months, and 50 per cent. within nine months from the passage and approval of the act. The question of paramount importance presented is: Had Congress, by the act approved March 4, 1915 (38 Stat. 1192, c. 169 [U. S. Comp. St. 1916, §§ 8639a–8639d]),

entitled "An act to amend an act entitled 'An act to promote the safety of employés and travelers upon railroads, and to compel common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances,'" and subsequent proceedings of the Interstate Commerce Commission thereunder, and prior to the commission of the offense charged, occupied the field intended to be covered by the act of the Legislature to the exclusion of that act?

The defendant is a common carrier of interstate and intrastate commerce, and the evidence shows without conflict that during the period covered by the indictment it operated all parts of its railroad as a common carrier of interstate commerce, as also of intrastate commerce, and that all of its locomotives in road service in the state in the nighttime were at all times covered by the indictment operated and used in hauling interstate and intrastate freight and passengers. The Congress of the United States having the paramount right to legislate upon all subjects affecting interstate commerce, it of course follows, from the exclusive nature of its authority, that when it once enters that field all state legislation upon or regulation of that particular subject is ipso facto excluded or superseded. On the other hand, it is equally well settled that in the absence of legislation by Congress the states are not denied the exercise of their police power to secure safety in the physical operation of railroad trains within their territory, even though such trains are used in interstate commerce, and interstate commerce is thereby incidentally affected, so long as it is not directly burdened or interfered with. The mere grant of such a power to Congress did not imply a prohibition on the states to exercise their power over the same subject within reasonable limitations.

The crucial test here, then, it will be observed, is: Had Congress so pre-empted or occupied the field as to nullify or supersede the operation of the act of the Legislature? The question must be answered in the negative (Atlantic Coast Line R. R. Co. v. Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312), unless that result is accomplished by the amendatory act of Congress of March 4, 1915, and proceedings of the Interstate Commerce Commission thereunder, to which we have referred. Sections 1 and 2 of that act (U. S. Comp. St. 1916, §§ 8639a, 8639b) are as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that section two of the act entitled 'An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto,' approved February 17, 1911, shall apply to and include the entire locomotive and tender and all parts and appurtenances thereof.

"Sec. 2. That the chief inspector and the two assistant chief inspectors, together with all the district inspectors, appointed under the act of February 17, 1911, shall inspect, and shall have the same powers and duties with respect to all the parts and appurtenances of the locomotive and tender that they now have with respect to the boiler of a locomotive and the appurtenances thereof, and the said act of February 17, 1911, shall apply to and include the entire locomotive and tender and all their parts with the same force and effect as it now applies to locomotive boilers and their appurtenances. That upon the passage of this act, all inspectors and applicants for the position of inspector shall be examined touching their qualifications and fitness with respect to the additional duties imposed by this act."

It was provided that the provisions of the act should not become effective for six months from its passage. Looking back to the original act, and reading into it the provisions of the amendatory act, section 2 provides that:

"From and after the 1st day of July, 1911, it shall be unlawful for any common carrier, its officers or agents, subject to this act, to use any locomotive engine propelled by steam power in moving interstate or foreign traffic, unless the 'entire locomotive and tender, and all parts and appurtenances thereto' are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb, and all 'locomotives and tenders, and all parts and appurtenances thereto' shall be inspected from time to time in accordance with the provisions of this act, and be made able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."

Section 3 (U. S. Comp. St. 1916, § 8632) provides for the appointment by the President, by and with the advice and consent of the Senate, of a chief inspector and two assistant chief inspectors of "locomotives and tenders, and all parts and appurtenances thereto," who shall have general superintendence of the inspectors thereinafter provided for, directing them in the duties thereby imposed upon them, and so that the requirements of the act, and the rules, regulations, and instructions made or given thereunder, are observed by the carriers subject thereto.

Section 6 (U. S. Comp. St. 1916, § 8635) requires each inspector to become familiar, as far as practicable, with the condition of "each locomotive and tender, and all parts and appurtenances thereto," ordinarily housed and repaired in his district, to make personal inspection of the entire locomotive and tender and all parts and appurtenances thereto under his care from time to time as may be necessary to fully carry out the provisions of the act. He shall see that the carriers make inspections in accordance with the rules and regulations established or approved by the interstate Commerce Commission, and that carriers repair the defects which such inspection discloses before the locomotive, or tender, or any part pertaining thereto, is again put in service. Whenever any district inspector shall, in the performance of his duty, find any locomotive, tender, or any part

or appurtenance thereto, not conforming to the requirements of the law, or the rules and regulations established and approved, as therein stated, he shall notify the carrier in writing that the locomotive is not in serviceable condition, and thereafter such locomotive shall not be used until put in serviceable condition.

Section 9 (U. S. Comp. St. 1916, § 8638) provides that any carrier violating the provisions of the act, or any rule or regulation made under its provisions, or any lawful orders of any inspector, shall be liable to a penalty, etc.

Pursuant to the amendatory act of March 4, 1915, the chief inspector submitted to the Interstate Commerce Commission for approval rules and instructions for the inspection and testing of locomotives and tenders, all of which were, at a general session held October 11, 1915, approved by the Commission, with the exception of Rules 18, 29, and 31. Rule 18 is not material. Rules 29 and 31 are as follows:

"29. *Lights—Locomotives Used in Road Service.*—Each locomotive used in road service between sunset and sunrise shall have a headlight which will enable persons with normal vision in the cab of the locomotive, under normal weather conditions, to see a dark object the size of a man for a distance of 1,000 feet or more ahead of the locomotive; and such headlights must be maintained in good condition.

"Locomotives used in road service, which are regularly required to run backward for any portion of their trip, except to pick up a detached portion of their trains, or in making terminal movements, shall have on their rear a headlight which will meet the foregoing requirements.

"When two or more locomotives are used in the same train, the leading locomotive only will be required to display a headlight."

"31. *Locomotives Used in Yard Service.*—Each locomotive used in yard service between sunset and sunrise shall have two headlights, one located on the front of the locomotive, and one on the rear, each of which will enable persons with normal vision, in the cab of the locomotive, under normal weather conditions, to see a dark object the size of a man for a distance of 300 feet or more; and such headlights must be maintained in good condition."

Those rules were referred to in the order of the Commission in the following manner:

"Whereas, all of the rules prepared by the chief inspector having been agreed to by representatives of the railroad employés, and all except rules numbered 18, 29, and 31 having been agreed to by representatives of the carriers; and whereas, it appearing that the interests of all may be best served by the immediate promulgation of the rules which have been agreed to, thus avoiding the delay incident to the consideration of evidence and briefs with respect to the said rules numbered 18, 29, and 31, which will be acted on later, the said rules and instructions have been fully considered by the Commission: It is ordered," etc.,

—and were not specifically adopted by the Commission, it is conceded, until June 6, 1916, after the commission of the offense charged. It is insisted by the state that not, at least, until June 6th, did Congress, or the Commission, assume jurisdiction over the specific subject of headlights, and that until that time the state was free to act. It is quite true—

"that the mere creation by Congress of the Interstate Commerce Commission, and the grant to it of a measure of control over interstate commerce, does not of itself, in the absence of specific action by the Commission, or by Congress itself, interfere with the authority of the states." Missouri Pac. R. R. Co. v. Larabee Flour Mills Co., 211 U. S. 612, 29 Sup. Ct. 214, 53 L. Ed. 352; Missouri, K. & T. R. Co. v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942.

But:

"When Congress acts in such a way as to manifest its purpose to exercise its constitutional authority, the regulating power of the states ceased to exist." Erie R. Co. v. N. Y., 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149, 52 L. R. A. (N. S.) 266, Ann. Cas. 1915D, 138.

In that case Congress had passed an act relating to the subject-matter there involved, but had postponed its operation for a period of one year, during which time it was insisted that the state was authorized to legislate on the same subject. In discussing the principle involved, the Supreme Court, referring to a similar contention made in the case of Northern P. R. Co. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237, said:

"We reversed the judgment on the ground that the view expressed was not 'compatible with the paramount power of Congress over interstate commerce,' and we considered it elementary that the police power of the state could only exist from the silence of Congress upon the subject, and ceased when Congress acted or manifested its purpose to call into play its exclusive power. It was further said that the mere fact of the enactment of the act of March 4, 1907 [34 Stat. 1415, c. 2939 (U. S. Comp. St. 1911, p. 1321)], was a manifestation of the will of Congress to bring the subject within its control, and to reason that because Congress chose to make its prohibitions take effect only after a year, it was intended to leave the subject to state power, was to cause the 'act of Congress to destroy itself. There was no conceivable reason, it was said, for postponing the prohibitions if it was contemplated that the state law should apply in the meantime. The reason for the postponement, it was pointed out, was to enable the railroads to meet the new conditions. The reasoning of the opinion and the decision oppose the contention of defendant in error, and of the Court of Appeals, that the state law and the federal law can stand together, because, as expressed by the Court of Appeals, 'the state has simply supplemented the action of the federal authorities,' and on account of special conditions prevailing within its limits has raised the limit of safety; and the form of the federal statute, although 'not expressly legalizing employment up to that limit, fairly seems to have invited and to have left the subject open for supplemental state legislation if necessary.' We realize the strength of these observations, but they put out of view, we think, the ground of decisions of the cases, and, indeed, the necessary condition of the supremacy of the congressional power. It is not that there may be division of the field of regulation, but an exclusive occupation of it when Congress manifests a purpose to enter it. Regulation is not intended to be a mere wanton exercise of power. It is a restriction upon the management of the railroads. It is induced by the public interest or safety and the Hours of Service Law of March 4, 1907, is the judgment of Congress of the extent of the restriction necessary. It admits of no supplement; it is the prescribed measure of what is necessary and sufficient for the public safety, and of the cost

and burden which the railroad must endure to secure it."

And in the case of Southern R. Co. v. Railroad Commission, 236 U. S. 439, 35 Sup. Ct. 304, 59 L. Ed. 661, it was said:

"Congress could pass the Safety Appliance Act [Act Cong. March 2, 1893, c. 196, 27 Stat. 531 (Comp. St. 1913, §§ 8605–8612)] only because of the fact that the equipment of cars moving on interstate roads was a regulation of interstate commerce. Under the Constitution, the nature of that power is such that, when exercised, it is exclusive, and ipso facto supersedes existing legislation on the same subject. Congress, of course, could have 'circumscribed its regulations' so as to occupy a limited field. * * * But, so far as it did legislate, the exclusive effect of the Safety Appliance Act did not relate merely to the details of the statute, and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employés. The states thereafter could not legislate so as to require greater, or less, or different, equipment; nor could they punish by imposing greater, or less, or different, penalties. For, as said in Prigg v. Com., 16 Pet. 618, 10 L. Ed. 1090: 'If Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the state Legislatures have a right to interfere, and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any further legislation to act upon the subject-matter. Its silence as to what it does not do is as expressive of what its intention is as the direct provisions made by it. * * * The will of Congress upon the whole subject is as clearly established by what it had not declared as by what it has expressed.' Without, therefore, discussing the many cases sustaining the right of the states to legislate on subjects which, while not burdening, may yet incidentally affect, interstate commerce, it is sufficient here to say that Congress has so far occupied the field of legislation relating to the equipment of freight cars with safety appliances as to supersede existing and prevent further legislation on that subject. The principle is too well established to require argument. Its application may be seen in rulings in the closely analogous cases relating to state penalties for failing to furnish cars, and to state penalties for retaining employés at work on cars beyond the time allowed by the Hours of Service Law."

"When the question is whether a federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182.

In C., R. I. & P. Ry. v. Hardwick Elevator, 226 U. S. on page 435, 33 Sup. Ct. on page 175, 57 L. Ed. 284, 46 L. R. A. (N. S.) 203, the court, speaking through Mr. Chief Justice White, uses the following pertinent language:

"As legislation concerning the delivery of cars for the carriage of interstate traffic was clearly a matter of interstate commerce regulation, even if such subject was embraced within that class of powers concerning which the state had a right to exert its authority in the absence of legislation by Congress, it must follow, in consequence of the action of Congress to which we have referred, that the power of the state over the subject-matter ceased to exist from the moment that Congress exerted its paramount and all-embracing authority over the subject. We say this because the elementary and long-settled doctrine is that there can be no divided authority over interstate commerce, and that the regulations of Congress on that subject are supreme. It results, therefore, that in a case where, from the particular nature of certain subjects, the state may exert authority until Congress acts, under the assumption that Congress, by inaction, has tacitly authorized it to do so, action by Congress destroys the possibility of such assumption, since such action, when exerted, covers the whole field, and renders the state impotent to deal with a subject over which it had no inherent, but only permissive power. Southern R. Co. v. Reid, 222 U. S. 434, 32 Sup. Ct. 140, 56 L. Ed. 257."

While courts will adopt any reasonable construction of which a statute is susceptible, in order to avoid striking it down as unconstitutional, yet, when we come to consider whether or not two powers—one of superior and the other of inferior jurisdiction—occupy the same field, it would seem proper that any reasonable doubt, if such there is, should be resolved in favor of the superior jurisdiction. There will be found running through the decisions of the state courts a growing tendency to yield such matters in favor of the superior jurisdiction. Western Union Tel. Co. v. Hawkins, 198 Ala. 682, 73 South. 973; Central of Ga. Ry. Co. v. Groesbeck & Armstrong, 175 Ala. 189, 57 South. 380.

Viewing the amendatory act of Congress of March 4, 1915, and the objects obviously designed to be attained, namely, the safety of interstate commerce, and of those who are employed in its movement, we cannot escape the conclusion that Congress had thereby so manifested a clear intent to occupy the field with respect to the entire equipment of locomotives engaged in interstate commerce, and every part thereof, as to exclude the right of the state, and that upon its approval, and irrespective of what may have been done by the Commission thereunder, it was in effect a caveat or warning to the states. The mere fact that the Commission had not made any specific rule with respect to headlights on locomotives, of the entire equipment of which it had assumed general supervision—its silence on the subject—may well be taken as an indication that existing conditions, up to the time it did promulgate such rules under and by virtue of the authority conferred by said act, were deemed by the Commission satisfactory. That was merely one of the details of a broad and general subject, which details seem to have been given attention after proper tests and investigation had been made. See orders and rules promulgated by the Interstate Commerce Commission on June 6 and December 26, 1916, relating to lights required to be used on locomotives.

In the very recent case of Vandalia R. Co.

v. Public Service Commission of Indiana, 242 U. S. 255, 37 Sup. Ct. 93, 61 L. Ed. 276 (opinion December 11, 1916), a somewhat similar act of the state of Indiana was under consideration; but the Supreme Court held that it would not then pass upon the effect of the provisions of the act of Congress of 1915, "for the reason that the decision of the Supreme Court of Indiana, refusing an injunction to restrain the enforcement of the state Commission's order, was rendered and judgment thereon entered before the passage by Congress of the act referred to." The significant suggestion, however, is there made by the court that:

"If, however, by virtue of the provisions of the act of 1915, or of any action heretofore or hereafter taken by the Interstate Commerce Commission under it, plaintiff in error is entitled to an injunction against the further enforcement of the order of the state Commission, that right may be asserted in another action, and will not be prejudiced by our present decision."

The result is that, entertaining the views above expressed, it becomes our duty to certify the question of the validity of the statute under consideration to the Supreme Court (section 1 of act approved April 18, 1911, 1 Ala. App. p. 10).

BROWN, J. (dissenting). I do not concur in the views expressed in the majority opinion prepared by the Presiding Judge, and deem it proper to state the reasons impelling my nonconcurrence.

The act of Congress approved February 17, 1911 (U. S. Comp. Stat. 1916, §§ 8630–8639), does not undertake to prescribe the type of boiler that shall be used on locomotives in moving interstate commerce, but provides that it shall be unlawful for common carriers to use "any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put," and provides for the appointment of inspectors to make inspection and determine whether or not the boiler and its appurtenances are in proper condition and safe to be used; nor does the act confer on the Interstate Commerce Commission any authority to extend the provisions of the act by rules or regulations adopted by it. The right of the carrier to determine what type of boiler shall be used, provided it is safe for use, is in no way impinged by the act.

The effect of the amendatory act approved March 4, 1915, which did not become effective until September 4, 1915, is to extend the provisions of the act of 1911 to embrace all parts of the locomotives, and confers upon the inspectors the same duties and powers as to all parts of the locomotive as was conferred by the original act with reference to the boiler and equipment. The act as amended does not undertake to grant authority to the Interstate Commerce Commission to extend the provisions of the act, so as to take away the right and duty of the carrier to select its locomotives and their equipment by the adoption of rules or otherwise. Under the provisions of the act of Congress, the carrier has the right to select and use any locomotive it may choose, provided it is safe for use and passes inspection as such.

The Act of the Alabama Legislature approved July 17, 1915 (Acts 1915, p. 257), occupies a different field, and takes away the right of the carrier to select headlights for its engines, except of a designated character and power, and in no way impinges on the right of inspection or the requirement that the equipment shall be safe for use. The act is subject to this reasonable construction, and it is the duty of the court to sustain it (Standard Oil Co. v. State, 178 Ala. 400, 59 South. 667); and the mere fact that the act affects railroad engines in interstate traffic does not destroy it (Austin v. Tennessee, 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835; Minn. Rate Case, 230 U. S. 352, 35 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18). The legislation of the state not covering the same field as the federal legislation, its enactment by the state Legislature was a proper and legitimate exercise of the police power. Vandalia R. R. Co. v. Public Service Commission of Indiana, 242 U. S. 255, 37 Sup. Ct. 93, 61 L. Ed. 276; Sligh v. Kirkwood, supra; Price v. Illinois, 238 U. S. 451, 35 Sup. Ct. 892, 59 L. Ed. 1400; Erie R. R. Co. v. Williams, 233 U. S. 685, 34 Sup. Ct. 761, 58 L. Ed. 1155, 51 L. R. A. (N. S.) 1097.

Manifestly, the act of Congress as last amended not impinging upon the right of the carrier to select its locomotives and their equipment, but merely requiring the use of safe locomotives, and even if it be conceded that the act confers upon the Interstate Commerce Commission the power to occupy that field, the act did not become effective until September 4, 1915, and the Commission did not act until December, 1916, long after the passage of the act of July 17, 1915, and the indictment and conviction of the defendant under that act. The mere granting of power to the Interstate Commerce Commission in no way affects the right of the state to legislate until that Commission occupies the field covered by the state legislation. Mo. P. Ry. Co. v. Larabee Flour Mills, 211 U. S. 612, 29 Sup. Ct. 214, 53 L. Ed. 352.

At the time the act of July 17, 1915, was passed and approved, the act of Congress was not in force, and therefore there was no obstruction in the way of state legislation. The act of the Legislature was not void, and when the act of Congress became effective, conceding that the Interstate Commerce Commission had the power to prescribe headlights, the effect was merely to supersede or

repeal the act of the Legislature as to further offenses, and in no way affected pending prosecutions for offenses committed prior to the adoption of the rules covering this field. Code 1907, § 7806.

### Response to Question Certified from Court of Appeals.

THOMAS, J. The Court of Appeals certifies to this court (1 Ala. App. 10) the question of the constitutionality of a statute, the act of July 17, 1915, commonly known as the Locomotive Headlight Law. Gen. Acts, 1915, p. 257. The act under consideration is entitled:

"An act relating to the safety of employés and other persons on railroads, by providing for power headlights on all engines operated in road service in the nighttime, with a penalty for a violation thereof. Section 1. Locomotives to be equipped with power headlights—Power of same—Exceptions. 2. Penalty. 3. Violation—Duty of circuit courts. 4. Act to take effect, when." Gen. Acts 1915, p. 257.

The act provides:

"That all companies, corporations, lessees, owners, operators or receivers of any railroad or railway company [with certain exceptions] operating a railroad or railway in whole or in part in this state, are hereby required to equip, maintain and use upon every locomotive being operated in road service in this state in the nighttime, a power headlight of not less than fifteen hundred candle power brilliancy, measured with the aid of a suitable reflector." Section 1.

And that:

"All companies, corporations, lessees, owners, operators or receivers required by this act to equip, maintain and use a headlight upon locomotives as prescribed in section 1 of this act, shall be required to equip twenty-five per cent. of such locomotives within six months from the passage and approval of this act; fifty per cent. of such locomotives within the nine months from said time; seventy-five per cent. of such locomotives within twelve months from said time, and all of such locomotives shall be so equipped within fifteen months from such time." Section 4.

Appellant contends that the act is unconstitutional: (1) Because it interferes with interstate commerce; (2) because it violates section 45 of the Constitution of Alabama; (3) because it is in conflict with federal laws on said subject, and (4) because its provisions are indefinite. The cause was tried without a jury, and the trial resulted in the conviction of the appellant and the imposition of a fine. The indictment found, and the prosecution thereon, was for an alleged violation of law occurring on or after February 18, 1916, and under the Alabama statute approved July 17, 1915.

By written agreement of counsel, most of the facts are admitted: That the defendant had not equipped 25 per cent. of its locomotives engaged in road service with electric headlights of 1,500 candle power brilliancy, measured with the aid of a suitable reflector; that all of the defendant's locomotives not so equipped, at all times during the period covered by the indictment, were engaged in hauling both intrastate and interstate passengers, freight, or other traffic; but that the defendant during such period did operate locomotives between termini both of which were within the state of Alabama, and that in some cases the cars containing the interstate traffic were switched and made up into trains, or switched out of trains for transfer to other trains or other lines at termini within the state of Alabama, and that interstate passengers hauled by some of said locomotives, after transferring from other lines, took passage on defendant's trains at one end of said termini, or left defendant's trains at other of said termini, within the state of Alabama; that the defendant operated lines of railroad or railway between points in the state of Alabama and points in other states, and operated locomotives which cross the state lines between Alabama and other states. The agreement of counsel further embraces the statutes and regulations and of the United States with respect to headlights for locomotives operated in road service in the nighttime, together with the act of Congress of March 4, 1915 (38 U. S. Stat. at Large, p. 1192), amending and extending the act (commonly known as the Boiler Inspection Law) of February 17, 1911 (36 U. S. Stat. at Large, p. 913), and the order of the Interstate Commerce Commission, made on October 11, 1915, relating to such locomotives.

The undisputed evidence shows that more than 75 per centum of the defendant's locomotives used and engaged in such agreed traffic were equipped with oil headlights. It will be seen, by an examination of the record that the evidence was without conflict, except on the questions: (1) Whether the oil headlight used by the defendant was a power light, within the meaning of the aforesaid act of the Alabama Legislature; and (2) whether said oil headlight was "of fifteen hundred candle power brilliancy, measured with the aid of a suitable reflector." On such disputed questions of fact, oral testimony was introduced.

The act of Congress in question (of March 4, 1915), which by its terms was to take effect six months after its passage, by its first section sought to promote the safety of employés engaged in interstate commerce, not only by specifying the equipment of locomotives with safe and suitable boilers and appurtenances thereto, but also by extending the provisions of the act of February 17, 1911, to "apply to and include the entire locomotive and tender and all parts and appurtenances thereof." By section 2 of the act the chief inspector and the two assistant chief inspectors, together with all the district inspectors, provided and appointed under the act of February 17, 1911, were given the same powers and charged with the same duties, with respect to all the parts and appurtenances of the

locomotive and tender, that they previously had with respect to the boiler of the locomotive and the appurtenances thereof. Section 3 declared that the safety appliance provisions of the act of February 17, 1911, or any order of the Interstate Commerce Commission promulgated under the Safety 'Appliance Act of March 2, 1893, and supplemental acts, shall not be held to be altered, amended, changed, repealed, or modified.

Looking to the act of 1911, it is pertinent to note that it required common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto; that it defined the terms "railroad," and "employés," as used in the act; that it made it unlawful to use any locomotive engine propelled by steam power, in the moving of such commerce, "unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put," and "may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb"; that the act provided for inspection, from time to time, in accordance with specifications, and required that the boilers of all such engines shall be able to withstand such test or tests "as may be prescribed in the rules and regulations"; that it provided for a chief inspector and two assistant chief inspectors, who were given "general superintendence of the inspectors" thereinafter provided for, for the enforcement of the provisions of the act. By this act, also, the duties of a common carrier were defined, embracing the filing of its rules and instructions for the inspection of locomotive boilers with the chief inspector, with the provision that such rules, etc., "after hearing and approval by the Interstate Commerce Commission," and after such modification as the Commission may require, become obligatory upon the carrier. The act further specified the extent and manner of the inspection to be made by the inspectors of locomotive boilers, and required notice to be given, in a proper case, of any defective boiler found, and provided for an appeal by the carrier affected to the chief inspector, and a re-examination of the alleged defective instrumentality by an assistant chief inspector or any district inspector 'other than the one from whose decision the appeal is taken, within the time designated. It further gave the right of appeal to the carrier, from the finding upon such re-examination, to the Interstate Commerce Commission. The act further provided for the investigation of accidents resulting from the failure, from any cause, of a locomotive boiler or of its appurtenances, and for detailed reports thereof to the chief inspector, and for reports, by the chief inspector, on request of the Interstate Commerce Commission. The act further provides penalties for violations of its provisions, and makes it the duty of district attorneys to bring suits for the same, and limits the appropriation for the enforcement of the conditions of the act for the fiscal year. 36 U. S. Stat. at Large, p. 913.

It is thus clear that by the act of February 17, 1911, Congress took' over the inspection and control of locomotive engines engaged in interstate commerce, so far as the equipment and maintenance of "boilers and appurtenances thereto" was concerned. The important question now is: Did Congress, by the amendatory act approved March 4, 1915, and by the subsequent proceedings thereunder of the Interstate Commerce Commission, prior to the commission of the offense charged, "occupy the field" intended to be entered and used by the act of the Legislature of the state of Alabama, to the exclusion of the latter authority?

By the agreement of counsel it was further admitted that, in accordance with the act of Congress of March 4, 1915, the chief inspector submitted to the Interstate Commerce Commission, for approval, rules and instructions for the inspection of locomotives and tenders and all their parts, and, under the general heading of Lights, proposed rule 29, relating to headlights on locomotives used in road service, rule 30, relating to classification lamps on locomotives used in road service, rule 31, relating to headlights on locomotives used in yard service, and rule 32, relating to cab lights. It does not appear from the record, however, when this report was made by the chief inspector to the Interstate Commerce Commission. A hearing was had September 28 to October 2, 1915, before said Commission, of the matter of the approval and establishment of said rules and instructions submitted by the chief inspector, and all of said proposed rules were agreed to by representatives of the railroad employés, and all (except those numbered 18, 29, and 31) were agreed to by representatives of the carriers. Rule 18 related to bells and bellringers. The rules so proposed by the chief inspector were approved and made effective January 1, 1916, with the exception of rules 18, 29, and 31, which were reserved by the Commission for consideration in connection with evidence and briefs with respect thereto. Said Rules 18, 29, and 31 were still under consideration by the Commission on October 11, 1915, when its order to the foregoing effect was entered.

It is recited in the order that under the act of March 4, 1915, and in compliance therewith:

"The chief inspector thereupon, in accordance with the law and with the expressed desire of the carriers, proceeded to prepare for submission to the Interstate Commerce Commission for approval rules and instructions for the inspection of locomotives and tenders and all their parts; * * * [and] whereas, all of the rules prepared by the chief inspector having been agreed to

by representatives of the railroad employés, and all except rules numbered 18, 29, and 31 having been agreed to by representatives of the carriers; and whereas, it appearing that the interests of all may be best served by the immediate promulgation of the rules which have been agreed to, thus avoiding the delay incident to the consideration of evidence and briefs with respect to the said rules numbered 18, 29, and 31, which will be acted on later, the said rules and instructions having been fully considered by the commission: It is ordered, that the said rules and instructions for the inspection of locomotives and tenders and all their parts, as follows, be, and the same are hereby, approved, and from and after the 1st day of January, 1916, shall be observed by each and every common carrier subject to the provisions of the act of Congress aforesaid as the minimum requirements: Provided, that nothing herein contained shall be construed as prohibiting any carrier from enforcing additional rules and instructions not inconsistent with the foregoing, tending to a greater degree of precaution against accidents."

Referring to the acts of the Interstate Commerce Commission, rules 29 and 31, of the three reported to the Commission by the chief inspector and by the Commission passed "to be acted on later," were respectively as follows:

(29) "Each locomotive used in road service between sunset and sunrise shall have a headlight which will enable persons with normal vision in the cab of the locomotive, under normal weather conditions, to see a dark object the size of a man for a distance of 1,000 feet or more ahead of the locomotive; and such headlights must be maintained in good condition. Locomotives used in road service, which are regularly required to run backward for any portion of their trip, except to pick up a detached portion of their train, or in making terminal movements, shall have on the rear a headlight which will meet the foregoing requirements. Nothing in the foregoing rules shall prevent the use of a device whereby the light may be diminished in yards and at stations to an extent that will enable the person or persons operating the locomotive to see a dark object the size of a man for a distance of 300 feet or more ahead of the locomotive under the same conditions as set forth above. When two or more locomotives are used in the same train, the leading locomotive only will be required to display a headlight."

(31) "Each locomotive used in yard service between sunset and sunrise shall have two headlights, one located on the front of the locomotive and one on the rear, each of which will enable persons with normal vision, in the cab of the locomotive, under normal weather conditions, to see a dark object the size of a man for a distance of 300 feet or more; and such headlights must be maintained in good condition."

It was further ordered:

"That said rules 29 and 31 be, and they are hereby, made applicable to all new steam locomotives put in service subsequent to October 1, 1916, and to all steam locomotives given general overhauling subsequent to October 1, 1916, and that all steam locomotives subject to the rules be equipped in conformity therewith not later than January 1, 1920."

The limited authority of the state, and the paramount authority of the federal government, in the regulation of commerce between the states, have often been the subjects of inquiry by the federal courts. It is conceded that the state has the inherent authority, under its police powers, to pass laws necessary to protect the property and the morals; as well as the lives of the people, and to promote the public convenience and the general prosperity. Such statutes have not been held to be invalid because incidentally affecting commerce between the states. Sligh v. Kirkwood, Sheriff, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835; Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Austin v. Tennessee, 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224: James Clark Distilling Co. v. Railway Co., 242 U. S. 311, 37 Sup. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845; Southern Express Co. v. Whittle, 194 Ala. 406, 69 South, 652, L. R. A. 1916C, 278. However, except as Congress interposes restraint, interstate commerce is deemed to be free. In re Rahrer, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572; United States v. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Robbins v. Shelby Taxing District, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694. In the Sligh Case, supra, the police power of the state and its extent was treated as follows:

"At an early day it was held to embrace every law or statute which concerns the whole or any part of the people, whether it related to their rights or duties, whether it respected them as men or citizens of the state, whether in their public or private relations, whether it related to the rights of persons or property of the public or any individual within the state. New York v. Miln, 11 Pet. 102, 139 [9 L. Ed. 648]. The police power, in its broadest sense, includes all legislation and almost every function of civil government. Barbier v. Connolly, 113 U. S. 27 [5 Sup. Ct. 357, 28 L. Ed. 923]. It is not subject to definite limitations, but is coextensive with the necessities of the case and the safeguards of public interest. Camfield v. United States, 167 U. S. 524 [17 Sup. Ct. 864, 42 L. Ed. 260]. It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health. Chicago, etc., Railway v. Drainage Commissioners, 200 U. S. 561, 592 [26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175]. * * * 'Whether it is a valid exercise of the police power is a question in the case, and that power we have defined, as far as it is capable of being defined by general words, a number of times. It is not susceptible of circumstantial precision. It extends, we have said not only to regulations which promote the public health, morals, and safety, but to those which promote the public convenience or the general prosperity. * * * And, further, it is the most essential of powers, at times the most insistent, and always the one of the least limitable of the powers of government.' Eubank v. Richmond, 226 U. S. 142 [33 Sup. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cas. 1914B, 192.]"

From the decisions of the United States Supreme Court, under the clause of the Constitution of the United States, "Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes" (Const. art. 1, § 8, cl. 3), it is now established: (1) That Congress was given the authority by the federal Constitution at all times to ade-

quately secure the freedom of interstate commerce from state control, and to provide effective regulation of that commerce as the national interest may demand; that this power, consistent with the grant to Congress, is reserved to the state, as to commerce that is confined within the state and does not affect other states. Gibbons v. Ogden, 9 Wheat. (6 U. S.) 1–34, 6 L. Ed. 23. (2) That the authority of Congress extends to every part of interstate commerce and to every instrumentality or agency by which it is carried on, and that the full control by Congress over the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579; Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508; McDonald v. State, 81 Ala. 279, 2 South. 829, 60 Am. Rep. 158; Mondou v. N. Y., N. H. & H. R. Co., 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; Western Railway Co. v. Mays, 72 South. 641,[2] and authorities. (3) That without action by Congress, the commerce clause of the Constitution "necessarily excludes the states from direct control of subjects embraced within the clause which are of such nature that, if regulated at all, their regulation should be prescribed by a single authority." Thus there is secured the "essential immunity of interstate intercourse from the imposition by the states of direct burdens and restraints." Minn. Rate Cases, supra; Cooley v. Board, 12 How. 299, 13 L. Ed. 996; South. Ry. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257.

It is further established: (4) That the state may "provide local improvements, create and regulate local facilities, and adopt protective measures of a reasonable character in the interest of the health, safety, morals, and welfare of its people, although interstate commerce may incidentally or indirectly be involved." Sligh v. Kirkwood, supra; Austin v. Tennessee, supra; James Clark Dist. Co. v. Railway Co., supra. (5) That where such matters, falling within the state power, "are also by reason of their relation to interstate commerce, within the reach of the federal power, Congress must be the judge of the necessity of federal action." (6) That the paramount authority of Congress enables it to intervene at its discretion for the complete and effective government of that which has been committed to its care, and "for this purpose and to this extent, in response to a conviction or national need, Congress may displace local laws by substituting laws of its own." Minn. Rate Cases, supra; Escanaba & L. M. T. Co. v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442; Morgan, etc., Co. v. Louisiana Board, 118 U. S. 455, 6 Sup. Ct. 1114, 30 L. Ed. 237; N. C. & St. L. Ry. v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352; Gladson v. Minnesota,

166 U. S. 427, 17 Sup. Ct. 627, 41 L. Ed. 1064; Lake Shore & C. R. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702; Erb v. Morasch, 177 U. S. 584, 20 Sup. Ct. 819, 44 L. Ed. 897; Northern Pac. Ry. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237. (7) That the power of Congress to regulate commerce comprehends authority to define what shall be commerce among the states, and, with a view to the appropriate exercise of its power, to distinguish between "things deleterious and things beneficial or innocuous," and to deny, absolutely or conditionally, entrance into such commerce of those things which are deleterious. State of W. Va. v. Adams Express Co., 219 Fed. 794, 135 C. C. A. 464, L. R. A. 1916C, 291; James Clark Dist. Co. v. Railway Co., 242 U. S. 311, 37 Sup. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845; supra; Southern Express Co. v. State, 188 Ala. 454, 66 South. 115; Southern Express Co. v. Whittle, supra; State ex rel. Black v. Southern Express Co. (Sup.) 75 South. 343.[3] (8) That although Congress may have enacted a law relating to a subject on which a state may legislate, yet if Congress limits its enactment, the subject is to such extent left open to state regulation; that is, where federal and state enactments relate to the same subject, and enforcement of the state statute can be had without embarrassment to the enforcement of the federal law, the state enactment will be permitted to operate in in aid of the federal. Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182; M., K. & T. Ry. Co. v. Haber, 169 U. S. 613, 623, 18 Sup. Ct. 488, 42 L. Ed. 878; Reid v. Colorado, 187 U. S. 148, 23 Sup. Ct. 92, 47 L. Ed. 108; Sligh v. Kirkwood, supra; Pacific Co. v. State of Washington, 222 U. S. 370, 377, 32 Sup. Ct. 160, 56 L. Ed. 237. (9) That Congress may delegate power to the Interstate Commerce Commission to promulgate rules relating to the equipment and conduct of locomotives engaged in interstate commerce; that the mere creation by Congress of the Interstate Commerce Commission, with the grant to it of a measure of control over interstate commerce, does not, of itself and in the absence of specific action by such Commission, or by Congress, interfere with the authority of the state to regulate, for the benefit of its citizens, in local matters, though such regulations indirectly affect interstate commerce. Missouri Pac. R. Co. v. Larrabee Flour Mills Co., 211 U. S. 612, 29 Sup. Ct. 214, 53 L. Ed. 352; Missouri, K. & T. R. Co. v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942; Atlantic Coast Line R. Co. v. State of Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312. (10) When, however, Congress acts in a way to manifest its purpose to exercise its constitutional authority to regulate commerce, the regulating power of the

---

[2] 197 Ala. App. 367.

[3] 200 Ala. 31.

state ceases to exist as to such a matter in such sphere of influence. Erie R. Co. v. N. Y., 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149, 52 L. R. A. (N. S.) 266, Ann. Cas. 1915D, 138; Nor. Pac. R. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237; Sou. R. Co. v. Railroad Comm., 236 U. S. 439, 35 Sup. Ct. 304, 59 L. Ed. 661; C., R. I. & P. Ry. v. Hardwick Far. Elevator Co., 226 U. S. 426, 33 Sup. Ct. 174, 57 L. Ed. 284, 46 L. R. A. (N. S.) 203; Adams Express Co. v. Croninger, 226 U. S. 491, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; Chicago, Ind. & L. R. Co. v. Hackett, 228 U. S. 559, 33 Sup. Ct. 581, 57 L. Ed. 966; McDermott v. Wisconsin, 228 U. S. 115, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39; Minn. Rate Cases, supra; Taylor v. Taylor, 232 U. S. 363, 34 Sup. Ct. 350, 58 L. Ed. 638.

The test of the constitutionality of the statute in question is: Had Congress "preempted or occupied the field" of legislation on the subject of locomotive headlights on engines engaged and used in interstate commerce, so as to nullify or supersede the operation of the Alabama statute? So far as the act of February 17, 1911, manifested that consummation, the answer must be in the negative; for it is clear that Congress therein and thereby limited its assumption of supervision of such engines to the boilers and appurtenances thereto. The headlights on such engines could not be said to be appurtenances of the "safe and suitable" boilers required by that act. 36 U. S. Stat. at Large, p. 913. Such was the gist of the decisions of the United States Supreme Court, sustaining the Georgia and Indiana headlight cases. Atl. Coast Line R. Co. v. State of Georgia, 135 Ga. 545, 69 S. E. 725, 32 L. R. A. (N. S.) 20; Id., 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312; State of Indiana v. Vandalia R. Co., 183 Ind. 49, 108 N. E. 97; Vandalia R. Co. v. Public Service Comm. of Indiana, 242 U. S. 255, 37 Sup. Ct. 93, 61 L. Ed. 276.

[1, 2] In determining whether a federal statute has superseded a state enactment, the entire scope and purpose of the statute must be considered; and that which needs to be implied within its statutory scope and intent is of no less force than that which is expressed in the act. When so considered, if the federal statute, in its chosen field of operation, will be "frustrated," and its provisions "refused their natural effect," the state law must yield to the superior authority of the federal law within the sphere of its delegated and assumed authority. Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Northern Pac. Co. v. Washington, supra; Southern Railway Co. v. Reid, supra; Savage v. Jones, supra. If the state statute has such indirect and incidental effect on the enforcement, or the abeyance, of such federal

statute, the state law can have no validity. Asbell v. Kansas, 209 U. S. 251, 28 Sup. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101; Reid v. Colorado, supra; Northern Pac. Co. v. Washington, 222 U. S. 388, 32 Sup. Ct. 160, 56 L. Ed. 237; Southern Railway Co. v. Reid, supra. The intent to supersede, by the federal act, the exercise by the state of its police powers, as to matters not covered by federal legislation, is not to be inferred "from the mere fact that Congress has seen fit to circumscribe and to occupy a limited field." Savage v. Jones, 225 U. S. 533, 32 Sup. Ct. 715, 56 L. Ed. 1182, and cases there collected by Mr. Justice Hughes; Atlantic Coast Line Railway Co. v. State of Georgia, supra; M., K. & T. Ry. Co. v. Harris, supra.

[3] In the Harris Case, supra, it was declared that in the application of this principle of supremacy by an act of Congress, in a case where the state law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together. Reid v. Colorado, supra; Sinnot v. Davenport, 22 How. 227, 243, 16 L. Ed. 243. The act of Congress, fairly interpreted, must actually conflict with the law of the state. Vandalia Railroad Co. v. Public Service Comm., supra; M., K. & T. Ry. Co. v. Harris, 234 U. S. 419, 34 Sup. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942; Savage v. Jones, 225 U. S. 533, 32 Sup. Ct. 715, 56 L. Ed. 1182; Atlantic Coast Line v. Georgia, 234 U. S. 294, 34 Sup. Ct. 829, 58 L. Ed. 1312; Missouri Pac. Ry. Co. v. Larrabee Flour Mills Co., 211 U. S. 622, 623, 29 Sup. Ct. 214, 53 L. Ed. 352. In the Vandalia Railroad Co. case, supra, Mr. Justice Pitney, in dealing with an injunction under an act of the state of Indiana similar to the Alabama statute in question, declined to pass upon the effect of the provisions of the act of Congress of 1915 as it applied to the Indiana statute, "for the reason that the decision of the Supreme Court of Indiana, refusing an injunction to restrain the enforcement of the state Commission's order, was rendered, and judgment thereon entered, before the passage by Congress of the act referred to." The court said:

"If, however, by virtue of the provisions of the act of 1915, or of any action heretofore or hereafter taken by the Interstate Commerce Commission under it, plaintiff in error is entitled to an injunction against the further enforcement of the order of the state commission, that right may be asserted in another action and will not be prejudiced by our present decision."

[4] When the amendatory act of Congress approved March 4, 1915, is read in connection with the Safe Locomotive Boilers Act of February 17, 1911, we cannot escape the conclusion that the intention of Congress is plain that the states must be excluded from the right to legislate within the field to which the several original acts, and the amendatory act extended the federal authority. It is immaterial that the final rules on the subject of

headlights to be used on such locomotives were not promulgated by the Interstate Commerce Commission until, respectively, June 6, and December 26, 1916, after the commission of the alleged offense for which the prosecution was had.

We are of the opinion, that the act of the Alabama Legislature of July 17, 1915, is contrary to the expressed purpose and scope of the amendatory act of Congress of March 4, 1915, and that as to engines engaged in interstate commerce it has no application. As to the other objections urged, it is unnecessary to discuss the same at length.

[5, 6] We find no merit in the insistence that the act is indefinite, nor in the objection, that it is offensive to section 45 of the Constitution of Alabama.

This opinion will be certified to the Court of Appeals as the answer to its inquiry as to the constitutionality of the act commonly known, as the Locomotive Headlight Law. All the Justices concur.

On Certificate from Supreme Court.

SAMFORD, J. The Supreme Court, in the foregoing opinion, having held that the act of the Alabama Legislature of July 17, 1915, is contrary to the expressed purpose and scope of the amendatory act of Congress of March 4, 1915, and that as to engines engaged in interstate commerce it has no application, and it appearing from the record that none of the engines of the defendant are engaged exclusively in intrastate business, and it having been said in the opinion that it was immaterial that the final rules on the subject were not promulgated until after the commission of the alleged offense, notwithstanding the argument of Judge Brown in his dissenting opinion in the Court of Appeals, which appears to us to be sound, the judgment in this case is reversed, and judgment will be here rendered discharging the defendant.

Reversed and rendered.