## CAB CURTAIN CASES.

CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant, vs. RAILROAD COMMISSION OF WISCONSIN, Respondent.

CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant, vs. SAME, Respondent.

MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, Appellant, vs. SAME, Respondent.

*October 23—November 17, 1925.*

*Commerce: Regulation of interstate commerce: Police legislation by state: Conflict with federal enactments: Railroads: Statute requiring cab curtains on locomotives: Order of railroad commission prescribing type: Validity.*

1. If legislation, though having for its purpose the promotion of the public health of the state, comes in conflict with legislation enacted by Congress pursuant to its power to regulate interstate commerce so that the two cannot stand together, then the state legislation must give way to the federal legislation. p. 237.

2. The burden was on the carriers to point out the federal legislation with which ch. 139, Laws of 1923, and the order of the railroad commission made in pursuance thereof, requiring railroads to equip their locomotives with approved cab curtains, come in conflict. p. 237.

3. The exercise of the power by Congress to promote safety in the prosecution of interstate commerce is one subject of legislation, and its exercise does not preclude the state from exercising its power to promote the health and welfare of its citizens, which is quite another legislative subject, and the legislation of each jurisdiction will stand unless they are repugnant to each other. p. 240.

4. The field of public health is a peculiar state prerogative and is not to be limited, by implication at least, even where Congress has legislated on the subject. p. 240.

5. Ch. 139 of the Laws of 1923, and the order of the state railroad commission made in pursuance thereof, are for the purpose of promoting the health or comfort of enginemen, and do not conflict with the federal Locomotive Boiler Inspection Act and its amendments, nor the Safety Appliance Act and its amendments, which have for their purpose the promotion

of public safety, no conflict appearing between such order
and the rules and regulations prescribed by the chief boiler
inspector and approved by the interstate commerce commis-
sion.   p. 242.

6. The question whether there is a conflict between the order of
   the railroad commission and the rules of the chief boiler
   inspector as approved by the interstate commerce commission
   will not be pursued by this court as to the mechanical prob-
   lems involved, where the federal authorities charged with the
   duty of enforcing the federal legislation do not suggest any
   such conflict and have at least acquiesced in the order of the
   commission, if they have not expressly approved it.   p. 243.

7. Said ch. 139 of the Laws of 1923, and the order of the rail-
   road commission pursuant thereto, are not invalid as impos-
   ing an undue burden on interstate commerce, since it is a
   law which the state has plenary power to pass in the interest
   of the public health.   p. 243.

8. A health law is not invalid because compliance therewith may
   carry heavy financial burdens.   p. 243.

9. If the validity of ch. 139 of the Laws of 1923 depended upon
   the reasonableness of the burden laid on interstate commerce,
   then all circumstances are to be taken into consideration.
   p. 244.

10. Ch. 139 of the Laws of 1923, by imposing on the railroad com-
    mission the duty to enforce compliance with the law, impliedly
    authorizes it to prescribe general specifications for curtains.
    p. 244.

11. A general order of the railroad commission pursuant to ch. 139,
    Laws of 1923, prescribing the minimum requirements for
    locomotive cab curtains generally, which order was applicable
    to all railroads within the state, is not invalid as made with-
    out notice after the first order had been declared invalid,
    where the commission had given all railroads notice and an
    opportunity to be heard upon the subject and the statute re-
    quiring no notice to be given to any one of such an order,
    and the judicial review provided by statute affording the
    railroads affected every requirement of due process of law.
    pp. 245, 246.

APPEALS from judgments of the circuit court for Dane
county: E. RAY STEVENS, Circuit Judge.   *Affirmed.*

For the appellants *Chicago & Northwestern Railway
Company* and *Chicago, Milwaukee & St. Paul Railway Com-
pany* there were briefs by *R. N. Van Doren* of Chicago,
*John F. Baker* of Milwaukee, and *Nye F. Morehouse* of

Chicago, attorneys for the *Chicago & Northwestern Railway Company*, and *H. H. Field* of Chicago, *Sanborn, Blake & Aberg* of Madison, and *C. S. Jefferson* of Chicago, attorneys for the *Chicago, Milwaukee & St. Paul Railway Company;* and the cause was argued orally by *Mr. Morehouse, Mr. Jefferson,* and *Mr. John B. Sanborn.*

For the appellant *Minneapolis, St. Paul & Sault Ste. Marie Railway Company* there was a brief signed by *W. A. Hayes* of Milwaukee, attorney, and *Henry S. Mitchell* of Minneapolis and *John B. Sanborn* of Madison, of counsel; and the cause was argued orally by *Mr. Hayes* and *Mr. Sanborn.*

For the respondent there was a brief by the *Attorney General* and *Robert M. Rieser* of Madison, special counsel, and oral argument by *Mr. Rieser.*

·OWEN, J.   These actions were brought by the respective appellants to review an order of the *Railroad Commission* requiring railroad companies operating in the state of Wisconsin to equip their locomotives with cab curtains as specified in said order.   The order of the *Railroad Commission* was affirmed by the judgment of the circuit court, and, according to stipulation approved by this court, one bill of exceptions entitled in all three cases was settled and returned to this court to be taken and considered as the bill of exceptions in each of said three cases.   The cases were argued together and will be disposed of in one opinion.

The order of the *Railroad Commission* was made pursuant to ch. 139, Laws of 1923.   That law prohibits any railroad company from using between the 15th day of November and the 1st day of April in each year any locomotive engine not equipped with approved cab curtains.   It provides that "such curtains shall be so constructed as to efficiently inclose the openings between the engine cab and the water tank or coal tender attached to such locomotive engine.   The windows of the cab shall be properly and

closely fitted and all openings for levers or pipes and all other openings whatsoever through which cold or drafts may bring discomfort to the occupants, shall be efficiently protected in such manner as may be required and according to plans approved by the railroad commission of Wisconsin." The law required all railroad companies to submit plans for such equipment to the *Railroad Commission* for approval not later than September 1, 1923. The law also provides that "It shall be the duty of the railroad commission of Wisconsin to enforce the provisions of this act."

In obedience to these provisions the various railroads of the state of Wisconsin submitted to the *Railroad Commission* plans for this equipment. The *Commission* having concluded that an efficient enforcement and administration of the law required the promulgation of a general order rather than the specific approval of individual plans and specifications submitted by the railroad companies, held hearings throughout the state upon due notice to the railroad companies and interested parties, and on October 31, 1923, issued its order prescribing minimum specifications for cab curtains which should be regarded as a compliance with said law. The order divided the state into two districts, all that district lying north of the Green Bay & Western Railroad system being called the northern district, and that portion of the state lying south of said system being called the southern district. Different specifications were prescribed for each district. Different specifications were also prescribed for switch engines and locomotives used in the transportation service. Each of the appellants brought actions to review this order in the circuit court for Dane county, attacking the reasonableness and validity of the order and challenging the jurisdiction of the *Commission* to make the same.

The trial of these actions commenced May 8, 1924, and at the conclusion of the evidence, on motion of the *Commission*, the record was returned to it for such modifica-

tion of its order of October 31, 1923, as it might find proper, in accordance with the provisions of sec. 195.32, Stats. The *Commission* amended its order, and under date of July 19, 1924, said amended order was submitted to the court with a return of a copy of the evidence previously taken by the court. This amended order was then considered and passed upon by the court in lieu of the first order, as required by said sec. 195.32. The court held that order invalid because it provided for a curtain or covering over the tank or tender. The court held that ch. 139, Laws of 1923, did not require any curtain or covering over the tank or tender, and that that part of the order of the *Railroad Commission* was beyond the powers which the statutes had conferred upon the *Commission*. Accordingly, it entered judgment declaring the whole order void. On the same day, and without any further notice or hearing, the *Railroad Commission* promulgated the order which these actions are brought to review. The order is identical with the order declared invalid by the court in the first action, except that the requirements contained in the former order for a tank or tender covering is omitted, and includes only so much of the former order as the court held valid in the former actions.

The principal contentions made by appellants are that the order imposes an undue burden upon interstate commerce, and that its requirements conflict with federal legislation and rules of the interstate commerce commission promulgated under Congressional authority. Manifestly, ch. 139, Laws of 1923, was enacted for the purpose of promoting the public health and comfort. As such it is a police regulation and, undoubtedly, within the powers of the state; but the legislation touches an instrumentality of interstate commerce the regulation of which, so far as exercised, is entirely within the power of the federal government. But for the fact that the legislation affects an instrumentality of interstate commerce the power of the state could not be ques-

tioned.   If, however, the legislation, though having for its
purpose the promotion of the public health of the state,
comes in conflict with legislation enacted by Congress pur-
suant to its power to regulate interstate commerce, so that
the two cannot stand together, then the state legislation
must give way to the federal legislation.   These principles
are so well established by the supreme court of the United
States that statements thereof are mere legal banalities.   It
is conceded by appellants that the legislation is valid unless
it conflicts with legislation enacted by Congress.   It is con-
ceded by the attorney general that the legislation is invalid
if it does conflict with federal legislation.   The burden,
therefore, rests upon the appellants to point out federal
legislation with which ch. 139, Laws of 1923, and the order
of the *Railroad Commission* made in pursuance thereof,
come in conflict.

Appellants meet this burden by referring to the so-called
Locomotive Boiler Inspection Act of February 17, 1911
(36 U. S. Stats. at Large, 913: U. S. Comp. Stats. secs.
8630–8639), and its amendments thereto, and also the
so-called Safety Appliance Act, enacted March 2, 1903 (32
U. S. Stats. at Large, 943), and the amendments to that
act.   The Boiler Inspection Act of February 17, 1911, is
entitled "An act to promote the *safety* of employees and
travelers upon railroads by compelling common carriers en-
gaged in interstate commerce to equip their locomotives with
*safe* and suitable boilers and appurtenances thereto."   It
prohibits the use of any locomotive engine in interstate com-
merce unless the boiler of said locomotive and appurtenances
thereof are in proper condition and "safe" to operate in
the service to which the same is put, that the same may
be employed in the active service of such carrier in moving
traffic without "unnecessary peril to life or limb," and all
boilers shall be inspected from time to time in accordance
with the provisions of the act, and be able to withstand
such test or tests as may be prescribed in the rules and

regulations therein provided for. The act also provides for a chief and two assistant boiler inspectors and charges them with the duty and authority of enforcing the act. It requires each carrier to file its rules and instructions for the inspection of locomotive boilers with the chief inspector, and, after hearing and approval by the interstate commerce commission, such rules and instructions, with such modifications as the commission requires, shall become obligatory upon such carrier. This act was amended March 4, 1915, so as to confer upon the boiler inspectors the same powers and duties with respect to all parts and appurtenances of the locomotive and tender that they then had with respect to the boiler of a locomotive and the appurtenances thereof, and provides that the said act of February 17, 1911, shall apply to and include the entire locomotive and tender and all their parts "with the same force and effect as it now applies to locomotive boilers and their appurtenances."

The contention is made that by this act Congress has assumed exclusive jurisdiction and dominion over locomotives used in interstate commerce, and it is apparent that this is so to the extent that it is necessary to promote the safety of the public and of the employees. This act is a safety act, pure and simple. It is entitled "An act to promote the safety of employees and travelers upon railroads," etc. Sec. 2 requires locomotive engines to be "safe to operate" and "without unnecessary peril to life or limb." There can be no doubt that the object which Congress had in view in enacting this legislation was the safety of the public and of the employees, and that so far as the accomplishment of such purpose is concerned Congress has taken possession of the legislative field and the subject of that legislation is withdrawn from state authority. But there is nothing in this act which even remotely suggests that the object and purpose of the federal legislation was to promote or protect public health, or the health and comfort of the employees, except in so far as that might incidentally result from the

promotion of their safety. However, the public health and the public safety afford two distinct fields of legislation. It is true that to some extent regulations promoting public safety also promote public health, but that fact alone cannot make a health regulation of a regulation distinctly in the interest of safety.

It is contended by appellants that the subject of this legislation is the locomotive and tender, and that by the enactment of the federal legislation the locomotive and tender were withdrawn as subjects of state legislation. It is true that the federal legislation relates to the locomotive and tender, but it is clear that the purpose of the federal interference was to make the locomotive safe, and that the jurisdiction which it took over the locomotive was circumscribed and limited to the extent necessary to accomplish the purpose of the legislation, namely, the safety of the public and of the employees. It is not likely that Congress had any interest in the weight, type, plan, or power of the locomotive as an æsthetic or utilitarian proposition any further than matters of safety are concerned. While the locomotive may be considered the *subject matter* of the legislation, the real subject, or object, or purpose of the legislation is public safety.

In *Missouri, K. & T. R. Co. v. Haber,* 169 U. S. 613, 627, 18 Sup. Ct. 488, Mr. Justice HARLAN said:

"Although the power of Congress to regulate commerce among the states, and the power of the states to regulate their purely domestic affairs, are distinct powers, which, in their application, may at times bear upon the same subject, no collision that would disturb the harmony of the national and state governments or produce any conflict between the two governments in the exercise of their respective powers need occur, unless the national government, acting within the limits of its constitutional authority, takes under its immediate control and exclusive supervision the entire subject to which the state legislation may refer. 'The same bale of goods,' Mr. Justice JOHNSON well said in his concurring

opinion in *Gibbons v. Ogden,* 'the same cask of provisions, or the same ship, that may be the subject of commercial regulations, may also be the vehicle of disease. And the health laws that require them to be stopped and ventilated are no more intended as regulations on commerce than the laws which permit their importation are intended to inoculate the community with disease. Their different purposes mark the distinction between the powers brought into action; and while frankly exercised, they can produce no serious collision.' 9 Wheat. 1, 235."

The power of Congress to promote safety in the prosecution of interstate commerce is one subject of legislation. The power of the state to promote the health and welfare of its citizens is quite another. By the exercise of the first power the states do not lose the second, and the legislation of each jurisdiction will stand unless they be repugnant to each other.

In *Reid v. Colorado,* 187 U. S. 137, at p. 148 (23 Sup. Ct. 92), it is said:

"It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has been often reaffirmed—that 'in the application of this principle of supremacy of an act of Congress in a case where the state law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.' "

It seems quite plain to us that the subject of the federal legislation is public safety, that no intention on the part of Congress to enter the legislative field of public health can be gathered from the act, and that by the legislation Congress did not intend to invade the legislative field of public health, which is conceded to be a peculiar state prerogative, and one not to be limited, by implication at least, even where Congress has legislated upon the subject.

In *Savage v. Jones,* 235 U. S. 501, 533, 32 Sup. Ct. 715, which held valid certain pure food legislation of the state of Indiana which prescribed regulations in addition to those prescribed by the federal Pure Food and Drug Act, it was said:

"But the intent to supersede the exercise by the state of its police power as to matters not covered by the federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the state. This principle has had abundant illustration."

We are referred to one rule adopted by the interstate commerce commission pursuant to authority conferred by the Boiler Inspection Act which it is claimed covers the field covered by the state regulation and the order of the *Railroad Commission* here under consideration. That is rule 116 (a), and which reads as follows:

"*Cabs.*—Cabs shall be securely attached or braced and maintained in a safe and suitable condition for service. Cab windows shall be so located and maintained that the enginemen may have a clear view of track and signals from their usual and proper positions in the cab."

Sub. (b) of the same rule reads as follows:

"Road locomotives used in regions where snowstorms are generally encountered shall be provided with what is known as a 'clear vision' window, which is a window hinged at the top and placed in the glass in each front cab door or window. These windows shall be not less than five inches high, located as nearly as possible in line of the enginemen's vision, and so constructed that they may be easily opened or closed."

It requires but a cursory consideration of these rules to indicate that they are not adopted for the purpose of promoting the health or comfort of enginemen, but merely for

the purpose of promoting safety. The storm and clear-vision window is not for the purpose of protecting the enginemen, but to enable the engineer to have a clear vision ahead. These rules no more trench upon the legislative field of public health than does the Boiler Inspection Act itself. Moreover, it well may be doubted whether under the Boiler Inspection Act, a measure intended to promote safety, the interstate commerce commission acquires any authority to pass rules and regulations limited to the promotion of the health or comfort of the enginemen without any relation to the subject of safety.

It remains to be considered whether there is any conflict between the order of the *State Railroad Commission* and the rules and regulations prescribed by the chief boiler inspector and approved by the interstate commerce commission. It is said that the attachment of the curtain in the manner prescribed by the order of the *Railroad Commission* will interfere with the grab-iron clearance required by the rules of the interstate commerce commission. As to this it is deemed sufficient to say that the record discloses that the form of curtain prescribed by the *Railroad Commission* has been in use by the Duluth, South Shore & Atlantic Railroad for two years without any complaint on the part of federal boiler inspectors or the interstate commerce commission that the presence of the curtains was in any manner in conflict with federal regulations. It also appears from the record that the order of the *Railroad Commission* was promptly complied with by practically all of the railroads of the state, including the Chicago, Burlington & Quincy, the Illinois Central, and the Green Bay & Western. The curtains prescribed were in use on the locomotives of these railroads during the winter of 1924–1925 without any suggestion from federal authority that their use was repugnant to federal regulations. More than this, the record discloses a letter addressed by Frank McManamy, a member of the interstate commerce commission, to Andrew R.

McDonald, a member of the *State Railroad Commission,* relating to the order of the *Railroad Commission* here under consideration, in which he says:

"I have carefully read the law and the order of your *Commission* and examined the blue-prints and do not find that the application of such curtains or the other requirements of the law in any way conflict with the federal locomotive inspection laws or the rules of instructions issued by this commission pursuant thereto."

In the light of this federal acquiescence in, if not express approval of, the order of the *Railroad Commission,* this court is not disposed to pursue this mechanical problem any further. Whether there is a conflict between the regulations is a question that should be left to the federal authorities to raise. It appearing that the federal authorities charged with the duty of enforcing the federal law have not suggested such a conflict, the matter will not be discussed further.

A detailed discussion of the Safety Appliance Act is unnecessary. For the reasons stated in connection with our consideration of the Boiler Inspection Act, we construe the Safety Appliance Act as an act limited to the promotion of public safety, and by the enactment of that legislation Congress has no more pre-empted the field of public health than it has by the passage of the Locomotive Boiler Inspection Act.

We do not think that there is anything in the contention that the law or the order imposes an undue burden upon interstate commerce. If we are correct, it is a law which the state has plenary power to pass in the interest of the public health. As a rule, such laws impose a burden upon some one, but it is a burden which must be borne for the public good. A health law is not invalid because compliance therewith may carry heavy financial burdens. If the state had power to pass this law, railroad companies cannot refuse compliance therewith because of the burdens imposed. *Erie R. Co. v. Board of Pub. Util. Comm'rs,* 254 U. S. 394,

41 Sup. Ct. 169. But, as a practical proposition, the burden is not a heavy one, comparatively speaking. The cost of equipping locomotives with cab curtains such as are prescribed in this order is insignificant in comparison with the total cost of the locomotive. If the validity of the law depends upon the reasonableness of the burden laid upon interstate commerce, then all circumstances are to be taken into consideration, and perhaps the conclusion reached becomes more a matter of human judgment than fixed rules or principles. *State ex rel. Oregon R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 Sup. Ct. 535; *Great Northern R. Co. v. Minnesota,* 238 U. S. 340, 35 Sup. Ct. 753. In such case the resulting benefits to the enginemen should be weighed in comparison with the cost involved, and when that is done we have no hesitancy in saying that ordinary considerations of humanity require protection such as is prescribed by this order. The appellants themselves do not deny that enginemen are entitled to some protection of this sort against the rigors of a northern winter climate, and frankly state that before this order was entered and before the law was passed they and each of them had provided cab curtains, but not of the efficient type required by the order of the *Railroad Commission.* We think that nothing more need be said concerning the validity of the law or the order on the ground that it imposes an undue burden upon interstate commerce.

It is further contended that ch. 139, Laws of 1923, gives to the *Railroad Commission* no power except that of approval or disapproval of plans for cab curtains required to be filed by the railroads. The law charges the *Commission* with the duty of enforcing its provisions. True, it says nothing concerning its powers to prescribe plans and specifications by general order. It is apparent that any efficient enforcement of the law calls for just such action as was taken by the *Railroad Commission,* and even though the power to prescribe general specifications for curtains is not expressly written in the law, it must be implied from the

duty imposed upon the *Commission* to enforce compliance with the law. The limited construction of the power of the *Commission* for which appellants contend would enable the railroad companies to evade the law by filing plan after plan which the *Commission* could not approve. The law confers upon the *Railroad Commission* very much the same power that is conferred upon the chief boiler inspector by the Boiler Inspection Act. That act required the railroad companies to file their rules and instructions for the inspection of locomotive boilers and for the approval of the interstate commerce commission, and after hearing and approval by the interstate commerce commission such rules and instructions, with such modifications as the commission might require, become obligatory upon the carrier. In the course of time, however, the interstate commerce commission promulgated a set of rules general in their scope and obligatory upon all carriers. We construe ch. 139, Laws of 1923, to confer upon the *Railroad Commission* the power exercised by it in promulgating the order here in question.

It is further said that the order is void because it was made by the *Railroad Commission* without notice to the appellants. The gist of this argument is that although they had notice of the proceedings of the *Railroad Commission* leading up to the promulgation of the order which was declared invalid by the court on the first trial, they had no notice, and, in fact, there were no proceedings or hearings on the part of the *Railroad Commission* preliminary to the order here in question, which was promulgated by it on the very day that the court held the first order invalid. It must be remembered that this order does not specifically affect these appellants. It is a general order applicable to all railroads in the state, and although there was no additional hearing after the first order was declared invalid, the *Railroad Commission* had given all railroads notice and an opportunity to be heard upon the general subject of the proper plans and specifications for cab curtains which should com-

ply with the law.    The statute requires the *Commission* to give notice of certain hearings such as those leading up to the making of rate and service orders.    But this is not such an order.    This order prescribes minimum requirements for cab curtains generally.    The statute requires no notice to be given to any one.    The judicial review provided by statute, of which appellants have availed themselves, affords them every requirement of due process of law.    *Ohio Valley W. Co. v. Ben Avon Borough,* 253 U. S. 287, 40 Sup. Ct. 527.

*By the Court.*—Judgment affirmed.