In the Matter of the Application of William C. Whish, Chairman, etc., of the New York State Legislative Board, Brotherhood of Locomotive Engineers, and Another, for a Certiorari Order against the Public Service Commission, Second District, of the State of New York.

Third Department, June 19, 1923.

Railroads — certiorari to review action of Public Service Commission holding that Railroad Law, § 77, relating to vestibule cabs on locomotives is in conflict with Federal statutes and cannot be enforced as to locomotives used in interstate commerce — field relating to equipment and safety of such locomotives is covered by Federal legislation and Railroad Law, § 77, is invalid — Public Service Commission had right to raise question.

The field relating to the equipment and safety of railroad locomotives used in interstate commerce is covered by Federal legislation and the rules of the Interstate Commerce Commission promulgated thereunder, and this State does not have the right to interfere in that matter and require the equipment of such railroad locomotives with vestibule cabs, though that particular provision for safety is not specifically covered by Federal legislation and the rules of the Interstate Commerce Commission.

Accordingly, section 77 of the Railroad Law is invalid in so far as it requires locomotives used in interstate commerce to be equipped with vestibule cabs.

The Public Service Commission was justified in refusing to enforce said section of the Railroad Law, even though it has no power to declare the statute unconstitutional.

Certiorari order granted out of the Supreme Court at the Albany Special Term on the 17th day of January, 1923, and entered in the office of the clerk of the county of Albany, directed to the Public Service Commission, Second District, commanding it to certify and return to said clerk's office all and singular its proceedings had in relation to the matter of its duty to secure the enforce-

ment of chapter 649 of the Laws of 1918, with respect to the equipment and use of vestibule cabs on locomotive engines in the State of New York.

*William E. Fitzsimmons,* for the petitioners.

*Ledyard P. Hale,* for the respondent.

HINMAN, J.:

This is an application to review the action of the Public Service Commission, Second District, in determining as a matter of law that the provision of section 77 of the Railroad Law relating to vestibule cabs on locomotives could not be enforced by reason of the fact that Congress has asserted authority over the equipment of locomotives employed in interstate commerce, thus occupying the field to the exclusion of the State. Section 77 of the Railroad Law, as amended by chapter 649 of the Laws of 1918, provides that vestibuled cabs " shall be so constructed as to attach to the sides of, and enclose all openings between the engine cab and the water tank or coal tender attached to such engine; provided, however, that nothing in this section shall be construed to inhibit the passage of a locomotive engine not so equipped with such * * * vestibuled cab, moving under its own steam either with or without a train, when such movement is from a point without this State through and to a point beyond its borders, or from a point without this State to a point within it, or from a point within this State to a point without it if such passage is for the purpose of moving it to or from a repair shop or shops for the purpose of repairing such locomotive engine, and when it is not intended for service within this State."

In 1911 Congress passed an act " to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto." (36 U. S. Stat. at Large, 913, chap. 103.) It is known as the Federal Locomotive Boiler Inspection Act of 1911. It provided in section 2 thereof (36 id. 913) that after a certain date it should be unlawful for such a carrier to operate locomotives unless the boiler and appurtenances thereof should be in proper condition and safe to operate and provided that all boilers should be inspected in accordance with the act and " be able to withstand such test or tests as may be prescribed in the rules and regulations " provided by the Interstate Commerce Commission. Section 5 of the act (36 id. 914) provided that each carrier should file its rules and instructions for the inspection of boilers with the chief inspector of the Commission and after hearing and approval by the Commission such rules and instructions with such modifications as the Commission required should become

obligatory upon such carrier. In 1915 this act was amended so as to provide that said section 2 " shall apply to and include the entire locomotive and tender and all parts and appurtenances thereof." The amendatory act of 1915 also provided that the inspectors of the Commission should inspect and " have the same powers and duties with respect to all the parts and appurtenances of the locomotive and tender that they now have with respect to the boiler of a locomotive and the appurtenances thereof," and it was further provided that " The said act of February seventeenth, nineteen hundred and eleven, shall apply to and include the entire locomotive and tender and all their parts with the same force and effect as it now applies to locomotive boilers and their appurtenances." (38 U. S. Stat. at Large, 1192, chap. 169.) The effect of this amendment was to require each carrier to file its rules and instructions with reference to the entire locomotive and tender and all their parts with the inspector of the Commission and after hearing and approval by the Commission such rules and instructions with such modifications as the Commission required should become obligatory upon the carrier. Pursuant to such amendatory act rules and instructions were so provided. The carriers acted in concert although that does not seem to be a requirement under the act. The Commission adopted rules with reference to cabs and provided as follows:

" 116 (*a*). *Cabs.*— Cabs shall be securely attached or braced and maintained in a safe and suitable condition for service. Cab windows shall be so located and maintained that the enginemen may have a clear view of track and signals from their usual and proper positions in the cab.

" (*b*) Road locomotives used in regions where snowstorms are generally encountered shall be provided with what is known as a ' clear vision ' window, which is a window hinged at the top and placed in the glass in each front cab door or window. These windows shall be not less than five inches high, located as nearly as possible in line with the enginemen's vision, and so constructed that they may be easily opened or closed.

" (*c*) Steam pipes shall not be fastened to the cab. On new construction or when renewals are made of iron or steel pipe subject to boiler pressure in cabs, it shall be what is commercially known as double strength pipe, with extra heavy valves and fittings.

" 117. *Cab aprons.*— Cab aprons shall be of proper length and width to insure safety. Aprons must be securely hinged, maintained in a safe and suitable condition for service, and roughened, or other provision made, to afford secure footing."

The Commission does not seem to have made any provision for

vestibule cabs such as provided for in section 77 of the Railroad Law of our State which was intended to protect the engineer and fireman from the inclement weather in winter. It is urged that this protection in winter is humane treatment of these employees and is likewise a safeguard against accident so far as the traveling public are concerned. Probably this is so and is a provision coming well within the police power of the State under ordinary circumstances. The sole question here is as to whether Congress has taken the field in such a manner as to exclude the right of the State to interfere in behalf of these engineers and firemen and the public traveling in this State. It is urged by the petitioners that the matter is one of local rather than national character in that no rule of uniformity throughout the country can be expected to be attempted by Congress or the Interstate Commerce Commission in view of the fact that there is a great variation in climate between various parts of the country. A rule of uniformity, however, like a rule of equal protection does not depend upon a geographical basis. It depends rather upon a reasonable classification applying the same rule to the same or kindred circumstances. Surely the power of the Federal government over interstate commerce cannot be limited to such a degree that a rule of interstate commerce must apply with equal force throughout the entire United States irrespective of conditions or circumstances. These conditions and circumstances might be so varying in the different sections of the country as to render Congress impotent to take the field to the exclusion of the States by reason of its inability to apply a rule suitable to a situation wherever found without applying the same rule to situations where it would not be applicable. In the case under consideration Congress has not provided in its statute for any rule of universal application but has distinctly provided that each carrier shall file with the Commission its proposed rules and instructions which are subject to the approval and modification of the Commission. The mere fact that the Commission has adopted a set of rules applicable generally through the concerted recommendations of the carriers as a matter of convenience, does not mean that the Commission cannot adopt a vestibule cab for the carriers operating in States where the rigors of the climate might demand it. The act of Congress clearly indicates the contrary.

The main underlying principle seems to have been conclusively settled since the early decisions of the United States Supreme Court. Where Congress takes the field it operates to supersede any State legislative action or to prevent any such legislative action upon the same subject. If it depends upon the intent of Congress as urged to determine whether or not Congress has taken the field, we find

that here the plain intent of Congress has been to act in the field by requiring the Interstate Commerce Commission to make such regulations as it deems proper with reference to the entire loco-motive and tender and all their parts. Having so taken the field the situation is covered as much by what is not done by the Inter-state Commerce Commission as by the regulations it has made. As early as the case of *Prigg* v. *Commonwealth of Pennsylvania* (16 Pet. 539, 617) the United States Supreme Court said: " If Congress have a constitutional power to regulate a particular sub-ject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the State Legislatures have a right to interfere, and, as it were, by way of complement to the legisla-tion of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, mani-festly indicates that it does not intend that there shall be any farther legislation to act upon the subject matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it.  *  *  *  The will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed."

This was quoted with approval and applied by the same court in *Southern Railway Co.* v. *R. R. Commission, Indiana* (236 U. S. 439), in which the Supreme Court of the United States held that safety appliance legislation of the State of Indiana must be regarded as superseded by the Federal Safety Appliance Act. (See 27 U. S. Stat. at Large, 531, chap. 196, § 4; Id. 532, § 7, as amd. by 29 id. 85, chap. 87.) The court there said (at p. 446): " Congress, in the exercise of its power to regulate interstate commerce, has legislated as to the appliances with which certain instrumentalities of that commerce must be furnished in order to secure the safety of employees. Until Congress entered that field, the States could legislate as to equipment in such manner as to incidentally affect, without burdening interstate commerce. But Congress could pass the Safety Appliance Act only because of the fact that the equip-ment of cars moving on interstate roads was a regulation of inter-state commerce. Under the Constitution the nature of that power is such that when exercised it is exclusive, and *ipso facto* supersedes existing State legislation on the same subject." The court further said in that case: " The test, however, is not whether the State legislation is in conflict with the details of the Federal law or supple-ments it, but whether the State had any jurisdiction of a subject over which Congress had exerted its exclusive control." (*Supra,* p. 448.)

This same test was applied as to the liability of an interstate carrier to an employee for injuries sustained in interstate commerce. Congress had provided that there should be liability only in the event that such injuries occurred through negligence. It was held that it was the intention of Congress to base the action upon negligence only and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence. (*Seaboard Air Line* v. *Horton*, 233 U. S. 492.) In that case there was a conflict between the Federal Employers' Liability Act (35 U. S. Stat. at Large, 65, chap. 149, as amd. by 36 id. 291, chap. 143) and State legislation of North Carolina with reference to safe place or appliances. The same question arose in relation to workmen's compensation and it was held in *New York Central R. R. Co.* v. *Winfield* (244 U. S. 147) that the New York State Workmen's Compensation Law was an attempt to occupy the same field as the Federal Employers' Liability Act by giving for a non-negligent injury compensation which by the act of Congress was impliedly denied. It was held that the Federal act could not be pieced out or supplemented by any State statute. In *Pennsylvania R. R. Co.* v. *Public Service Commission* (250 U. S. 566, 569) the court said: " But when the United States has exercised its exclusive powers over interstate commerce so far as to take possession of the field, the States no more can supplement its requirements than they can annul them." In the matter of the equipment of locomotives and tenders and of all their parts, Congress has said that they shall be equipped as required by the rules of the Interstate Commerce Commission. It has just as effectively said that there shall not be any other legislation upon the subject-matter. The Interstate Commerce Commission acting under its authority as a *quasi* legislative body has said that the cabs of locomotives shall meet certain requirements. The Interstate Commerce Commission has just as effectively said under the decisions that no other equipment shall be required. The State has no power to fill what it may regard as an hiatus left by Congress and the Commission.

The Court of Appeals of Alabama in *Louisville & N. R. Co.* v. *State* (16 Ala. App. 199; 76 So. Rep. 505) has had occasion to similarly consider the effect of the amendatory act of Congress of March 4, 1915, which was therein named as an amendment of the Federal Safe Locomotive Boilers Act, in its relation to a statute of Alabama, known as the Locomotive Headlight Law of that State. (See Ala. Gen. Acts of 1915, p. 257, No. 181.) The Court of Appeals of Alabama after carefully reviewing the decisions held that the State law must yield to the superior authority of the Federal law. The court said: " Viewing the amendatory act of

Third Department, June, 1923. [Vol. 205

Congress, March 4th, 1915, and the objects obviously designed to be obtained, namely, the safety of interstate commerce, and of those who are employed in its movement, we cannot escape the conclusion that Congress had thereby so manifested a clear intent to occupy the field with respect to the entire equipment of locomotives engaged in interstate commerce, and every part thereof, as to exclude the right of the State, and that upon its approval, and irrespective of what may have been done by the Commission thereunder, it was in effect a caveat or warning to the States. The mere fact that the Commission had not made any specific rule with respect to headlights on locomotives, of the entire equipment of which it had assumed general supervision — its silence on the subject — may well be taken as an indication that existing conditions, up to the time it had promulgated such rules under and by virtue of the authority conferred by said act, were deemed by the Commission satisfactory. That was merely one of the details of a broad and general subject, which details seem to have been given attention after proper tests and investigation had been made." In that case, after certification to the State Supreme Court and response duly certified as required by law, it was held that the Federal act excluded the State from the right to legislate on the matter of interstate locomotive equipment, though final Federal rules on the subject of headlights on interstate locomotives were not promulgated by the Interstate Commerce Commission until after a railroad, charged with violating the Locomotive Headlight Law of the State, committed the offense.

It is urged that the Public Service Commission is an agency of the State to carry out the direct mandates of its superior, the Legislature of this State, and that the Commission had no right to question the legality of the State statute. Assuming, however, that the Commission had no judicial power to declare the statute unconstitutional, the question is now before us and as said by the United States Supreme Court in *Pennsylvania R. R. Co.* v. *Public Service Commission* (250 U. S. 566 at p. 568): " Whatever powers a State may deny to its Commissions it cannot give them power to do what the laws of the United States forbid, whether they call their action administrative or judicial."

The determination of the Commission should be confirmed, with fifty dollars costs and disbursements.

Present — H. T. KELLOGG, Acting P. J., VAN KIRK, HINMAN and HASBROUCK, JJ.

Determination unanimously confirmed, with fifty dollars costs and disbursements.