CHICAGO & NORTHWESTERN RAILWAY CO. *v.* MICHIGAN
PUBLIC UTILITIES COMMISSION.

COMMERCE—"CAB CURTAIN ACT" NOT IN CONFLICT WITH FEDERAL
STATUTES—CONSTITUTIONAL LAW.
   On appeal from a decree dismissing the bill in a suit by a railway company to enjoin the enforcement of an order of the public utilities commission under the so-called "cab curtain act" (Act No. 139, Pub. Acts 1921, as amended by Act No. 127, Pub. Acts 1923), the decision of the court below that said act and the order promulgated pursuant thereto should be held to be valid as a proper exercise of the police power of the State, and not in conflict with the Federal "safety appliance acts," is affirmed by an equally divided court.[1]

[1] Commerce, 12 C. J. § 15.

Appeal from Ingham; Collingwood (Charles B.), J. Submitted April 10, 1925. (Docket No. 62.) Decided March 20, 1926.

Bill by the Chicago & Northwestern Railway Company against the Michigan public utilities commission to enjoin the enforcement of an order under Act No. 127, Pub. Acts 1923. From a decree dismissing the bill, plaintiff appeals. Affirmed by an equally divided court.

*Frank A. Bell* and *Nye F. Morehouse* (*R. N. Van Doren,* of counsel), for plaintiff.

*Andrew B. Dougherty,* Attorney General, *O. L. Smith,* Assistant Attorney General (*Samuel H. Rhoads,* of counsel), for defendant.

STEERE, J. Plaintiff is a duly organized and incorporated railway company which is and has been for many years engaged as a common carrier operating its lines in Michigan, Wisconsin, Illinois and other States into which they extend carrying passengers and freight by rail, both in intra- and inter-state commerce. In 1921 the legislature of this State passed the so-called "cab curtain law" (Act No. 139, Pub. Acts 1921 [Comp. Laws Supp. 1922, § 8396 (24)]) entitled:

"An act requiring railroad companies to equip locomotive engines with either cab curtains or vestibule cabs, providing a penalty for the violation of this act, and making it the duty of the Michigan public utilities commission to enforce its provisions."

By a provision in section 1 of this act it was not to be construed as prohibiting engines not so equipped moving on their own steam,—

"either with or without a train when such a movement is from a point without this State, through and to a

point beyond its borders, or from a point without the State to a point within it, or from a point within this State to a point without it, if such passage is for the purpose of moving it to or from a repair shop or shops for the purpose of repairing such locomotive engine, or when it is not intended for service within this State."

Section 1 of this act and its title were amended by Act No. 127, Pub. Acts 1923, omitting that proviso, the amended title and section being as follows:

"An act requiring railroad companies to equip locomotive engines with either cab curtains, vestibule cabs, housing and other devices for the safety and health of railroad employees, providing a penalty for the violation of this act, and making it the duty of the Michigan public utilities commission to enforce its provisions.

"SECTION 1. It shall be unlawful for any railroad company to use within the State of Michigan on its line or lines December first to April first of each year, any locomotive engine not equipped with either approved and suitable cab curtains, vestibule cab, housing and other devices for the safety and health of locomotive enginemen not in conflict with rulings of the interstate commerce commission, as the Michigan public utilities commission may require to be placed upon the engine cab, water tank or coal tender: *Provided,* That no railroad company shall be required to place housings over the coal tender of any locomotive unless such locomotive is to be used north of Straits of Mackinac: *Provided further,* That the said Michigan public utilities commission shall be the judge as to the necessity for and the manner of equipping such locomotive engines relative to the closing of the openings between the engine cab and the water tank or coal tender, and may require such curtains, housings or other devices as it may deem necessary to meet the conditions in the several localities in the State of Michigan which will give reasonable protection to the enginemen: *Provided further,* That the Michigan public utilities commission may from time to time order such changes and additional equipment as the

commission may deem necessary for the proper pro-
tection of the enginemen."

Plaintiff's Michigan lines extend into and through
the western part of the upper peninsula of this State.

Between September 9, 1921, and October 4, 1923,
the Michigan public utilities commission promulgated
five different orders with respect to the equipment re-
quired by locomotives in the State of Michigan under
its so-called "cab curtain law." One of these orders,
dated January 4, 1922, particularly refers to plain-
tiff's locomotive cab curtain equipment, with which
plaintiff complied and equipped its locomotives with
the type of cab curtains ordered by the commission.

On October 4, 1923, another order was made by the
commission under the amended act, against which
this bill was filed, to restrain its enforcement on the
ground that the act as amended is unconstitutional and
the order void because it seeks by State legislation
to invade a field already occupied by congressional
legislation under the Federal Constitution; and also
because the order complained of is oppressive, un-
reasonable, and arbitrary in that it compels plaintiff
to discard equipment recently installed by order of
the commission and otherwise equip its engines for
the same purpose at a heavy expense with impractical
appliances which would result in increased danger.

That portion of plaintiff's system most directly af-
fected by the contested order consists of lines which ex-
tend north of and from Green Bay, Wisconsin, through
Menominee and Escanaba to Ishpeming, Michigan,
from Green Bay to Iron river, Michigan, from Es-
canaba to Watersmeet in Michigan, and two other
short lines within this State known as the Schlessinger
and Metropolitan branches. It also owns and oper-
ates a line between Antigo and Ashland, Wisconsin,
which crosses the Michigan State line at Ironwood.
These lines all connect with plaintiff's lines extending

southward through Milwaukee, Wisconsin, to Chicago, Illinois, there connecting with its lines extending westward and northerly through Illinois, Wisconsin, Iowa, Nebraska, Minnesota, North and South Dakota and Wyoming.

During the winter season plaintiff operates in Michigan an average of 89 locomotives used daily in moving interstate commerce, passenger and freight, the bulk of its traffic being iron ore, forest products and food supplies, with other miscellaneous freight.   The traffic over its system in the ten States where its lines run being more or less seasonal, these are interchanged and transferred from time to time to other territory where its lines extend as conditions render expedient.

In other northern States through which its lines extended, plaintiff had abundant experience with heavy falls of drifting snow and long before the Michigan cab curtain law was enacted adopted cab curtains and other equipment for protection against invading snow found from experience, as it claims, to be the most efficient and practical in actual operation.   The comparative efficiency of the equipment now in use by plaintiff and that ordered by defendant was made an issue of fact by the conflicting testimony of experienced railroad engineers.

Defendant's order of October 4, 1923, required the cabs to be equipped with two curtains at the gangway on each side, instead of the one now used by plaintiff, which extends over each gangway from the cab back to the front of the tank and from the top of the cab down to the deck, is held at the bottom by a flap turned in on top of the deck and weighted down to close the opening from below, with a cape curtain hanging above at the top of the side curtains, across the back of the cab and fastened to a wooden bulkhead on the tender.   It also has a drop curtain at the back of the cab hanging down to the top of the tank and

closing the opening between cab and tank.   The side curtains are made rigid at the rear edge by thin strips of wood, held in place by clips on the front of the tender in such manner that they can be easily sprung off by one hastily leaving the cab.   It is contended that the double curtains ordered by defendant obstruct hasty exit from the cab, occasioning delay and increasing the danger in case of an emergency.   Plaintiff also points out that the hood curtain at the rear of the cab as used by it does not prevent the enginemen having a clear view to the rear through the back windows, while that prescribed by defendant does and is in conflict with rule 116 of the interstate commerce commission which requires cab windows to be so located and maintained that the enginemen may have a clear rear view of the track and signals from their proper positions in the cab.   We do not find that this is controverted except by testimony that the usual and best view to the rear for the enginemen while snow is flying is by leaning out of the side windows of the cab.

By order of March 13, 1911, relative to safety appliances, the interstate commerce commission required side handholds, commonly called "grab irons," to be safely fastened, "One on each side of the tender near gangway; one (1) on each side of the locomotive at gangway; applied vertically."   Plaintiff's grab irons on the tank are placed at the gangway on the front tank corners and do not extend outward beyond its extreme width.   To avoid objections made by the Federal inspectors to the prescribed curtains, which it was claimed interfered with use of the grab irons where placed, it would be necessary in order to comply with defendant's curtain requirements to put on new grab irons back from the front around the corner on the outside of the tank.   This with the clearance space imposed by the interstate commerce commission

required a heavier grab iron, 1¼ inch thickness, so projecting beyond the sides of the tender as to increase its width 7½ inches over all, which plaintiff claimed necessitated rebuilding and widening certain of its roundhouses, that at Escanaba with 32 stalls being so constructed that the entrances could not be widened without rebuilding. Defendant's cab curtain order also required the construction of tank housings on top of the tenders which plaintiff claimed under its proofs would bring the top of the housing as high as the engine cab on its large locomotives and reduce their coal carrying capacity, make it impossible to coal up at certain of its coaling chutes without reconstructing and raising them, and the added weight of the tank housing would increase the total load of the tender from 1,500 to 2,000 pounds, which, with a full load of coal, would be beyond the carrying capacity of the tender axles, either necessitating replacing them with heavier and stronger axles or carrying lighter loads of coal and coaling oftener, all of which would cause delay and heavy expense, decrease efficiency of operation and impose an extra burden on interstate commerce.

While most of the testimony relating to those physical conditions is primarily directed to the claim of unreasonable, arbitrary, and impractical features of the order, and in many respects raises issues of fact, undisputed features of the testimony bear more or less upon plaintiff's contention that the cab curtain act and order under it are void because the Federal authorities occupy the field. That claim is founded primarily on the so-called "boiler inspection act" passed by congress on February 17, 1911, as amended March 4, 1915 (36 U. S. Stat. p. 913, 38 Id. p. 1192), entitled:

"An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their

locomotives with safe and suitable boilers and appurtenances thereto."

To more plainly outline and enlarge the duties of Federal officials administering the act and make more clear and comprehensive the significance of "appurtenances," this amendment definitely included the entire locomotive and its tender in a single unit, as follows:

"SECTION 2. That the chief inspector and the two assistant chief inspectors, together with all the district inspectors appointed under the act of February seventeenth, nineteen hundred and eleven, shall inspect and shall have the same powers and duties with respect to all the parts and appurtenances of the locomotive and tender that they now have with respect to the boiler of a locomotive and the appurtenances thereof, and the said act of February seventeenth, nineteen hundred and eleven, shall apply to and include the entire locomotive and tender and all their parts with the same force and effect as it now applies to locomotive boilers and their appurtenances. That upon the passage of this act all inspectors and applicants for the position of inspector shall be examined touching their qualifications and fitness with respect to the additional duties imposed by this act."

Administered in connection with the safety appliance acts of congress under direction of the Federal interstate commerce commission, inspection of boilers is but one of many duties required by this act and already imposed by numerous rules prescribed by the commission, extending through all parts of the mechanism and equipment of locomotives and tenders, including the following titles:

"Stay bolt testing—Safety valves—Water glass — Flue plugs—Ash pans—Brake and signal equipment— Draw gear and draft gear—Driving gear—Lights — Running gear—Tenders—Throttle and reversing gear —Accident reports," etc.

Various of the 162 rules in evidence promulgated by the interstate commerce commission on that subject

prescribed in detail equipment which naturally is for the convenience, comfort and health of the enginemen, as well as for their own safety and that of their engines or the trains they are hauling. Rule 132 prescribes that certain lights shall be located in cabs for their convenience. Rule 152 prescribes that tender frames shall be maintained in "safe and suitable condition for service," that the difference in height between the tender deck and cab floor on the locomotive "shall not exceed 1½ inches" and the "minimum width of the gangway between locomotive and tender, while standing on straight track, shall be 16 inches." Rules 116 and 117 are as follows:

"116 (a) *Cabs.*—Cabs shall be securely attached or braced and maintained in a safe and suitable condition for service. Cab windows shall be so located and maintained that the enginemen may have a clear view of track and signals from their usual and proper positions in the cab.

"(b) Road locomotives used in regions where snowstorms are generally encountered shall be provided with what is known as a "clear vision" window, which is a window hinged at the top and placed in the glass in each front cab door or window. These windows shall be not less than 5 inches high, located as nearly as possible in line of the enginemen's vision, and so constructed that they may be easily opened or closed.

"(c) Steam pipes shall not be fastened to the cab. On new construction or when renewals are made of iron or steel pipe subject to boiler pressure in cabs, it shall be what is commercially known as double strength pipe, with extra heavy valves and fittings.

"117. *Cab aprons.*—Cab aprons shall be of proper length and width to insure safety. Aprons must be securely hinged, maintained in a safe and suitable condition for service, and roughened, or other provisions made, to afford secure footing."

Certain basic principles involved in this inquiry are too well settled to invite discussion or extended citation

of authority.    As early as 1842 it was said by our Federal Supreme Court:

"For, if congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the State legislatures have a right to interfere; and, as it were, by way of complement to the legislation of congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose.    In such a case, the legislation of congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any further legislation to act upon the subject-matter.    Its silence as to what it does not do, is as expressive of what its intention is, as the direct provisions made by it.    This doctrine was fully recognized by this court, in the case of *Houston* v. *Moore,* 5 Wheat. 1, 21, 22; where it was expressly held, that where congress have exercised a power over a particular subject given them by the Constitution, it is not competent for State legislation to add to the provisions of congress upon that subject; for that the will of congress upon the whole subject is as clearly established by what it has not declared, as by what it has expressed."    *Prigg* v. *Pennsylvania,* 16 Pet. (U. S.) 539-617.

*Vide,* also, *Oregon-Washington, etc., Navigation Co.* v. *Washington,* U. S. Adv. Ops. 1925-26, p. 332 (46 Sup. Ct. 279).

This was referred to and quoted in substance with approval in *Southern R. Co.* v. *Railroad Commission,* 236 U. S. 439 (35 Sup. Ct. 304), wherein it was held that an Indiana act requiring railway companies to place grab irons on sides and ends of every car operating in that State had been superseded by the Federal safety appliance act.

The defense, as stated in its counsel's brief, is based on the contention that neither the boiler inspection act nor any other Federal statute or rule covers the Michigan cab act to exclusion of inherent authority of the State under its police powers to legislate "for the

benefit of the health and protection of its citizens," citing and quoting in support of that contention the following, from *New York, etc., R. Co.* v. *New York,* 165 U. S. 628 (17 Sup. Ct. 418) :

"While the laws of the States must yield to acts of congress passed in execution of the powers conferred upon it by the Constitution (*Gibbons* v. *Ogden,* 9 Wheat. 1, 211), the mere grant to congress of the power to regulate commerce with foreign nations and among the States did not of itself and without legislation by congress, impair the authority of the States to establish such reasonable regulations as were appropriate for the protection of the health, the lives and the safety of their people."

Unquestionably a State may legislate upon a subject-matter while the power vested in the Federal government to do so remains dormant. In the case quoted from, the New York law there involved was passed in the absence of any action by congress on the subject. In the instant case congress had, under the power vested in it by the commercial clause of the Federal Constitution, enacted both the safety appliance laws and the boiler inspection act with its amendment before the enactment of the Michigan cab curtain law. These Federal acts had been reviewed and construed in numerous decisions of appellate courts both State and Federal. Presumptively the amendment of the boiler inspection act was not without purpose, and it is significant that both *Atlantic Coast Line R. Co.* v. *Georgia,* 234 U. S. 280 (34 Sup. Ct. 829), and *Vandalia R. Co.* v. *Public Service Commission,* 242 U. S. 255 (37 Sup. Ct. 93), cited and stressed for defendant, arose prior to the amendment of 1915.

A recent well considered case directly bearing upon the scope of the boiler inspection act as amended is *Atlantic Coast Line R. Co.* v. *Napier,* 2 Fed. (2d Series) 891. The court there had under consideration an act passed by the State of Georgia requiring loco-

motives operating within the State to be equipped with a described automatic door to the fire-box.   Suit was brought by the railway company to enjoin its enforcement on the same grounds urged here by plaintiff.   In granting the relief asked, the court there quoted the amendment of 1915 and discussed analogous questions to those raised here, in part as follows:

"The interstate commerce commission, since the amendment of 1915 (Comp. St. § 8604a), has promulgated rules of inspection regarding many appliances, looking to safety on locomotives, including headlights of a stated capacity, cab windows of specified arrangement, and having protection from obscuration by snow, whistles, sanding apparatus, and the like.   *   *   *   But, whether it (the State law) be an effort to regulate commerce by acting on its instrumentalities or an exercise of police power, the State statute as applied to the locomotives of carriers engaged in interstate commerce finds the field fully occupied by paramount Federal legislation.   By the enactments of 1915 and 1924 above referred to congress has required of such carriers the use of locomotives in proper condition and safe to operate in all their parts and appurtenances, and authorized the commission, by rules and regulations, to fix the standard of safety and propriety.

"Though the act contemplates liberty in the carrier to initiate these rules and regulations for the commission's approval, the commission may disapprove what is offered, and promulgate its own tests of fitness. This resembles the process of rate making, and, just as the rates when approved and filed are the exclusive law of transportation to which they apply, so these rules, when approved, are the law of locomotive equipment.   *   *   *   The title of the act of 1911 states that its purpose was to 'compel common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto,' not simply to inspect and keep in order such boilers and appurtenances as they had.   *   *   * This purpose by the amendments is broadened into the compelling of a safe locomotive in all its parts and

appurtenances. When a locomotive meets the tests and rules fixed by the commission, it must, so far as carriers of interstate commerce are concerned, be esteemed proper and safe. The States cannot supplement or take from the requirements. There can be no division of responsibility and control. The provisions made by congress are exclusive. *Erie R. Co.* v. *New York,* 233 U. S. 671 (34 Sup. Ct. 756, 52 L. R. A. [N. S.] 266, Ann. Cas. 1915D, 138)."

Defendant's counsel urge that the State legislature exercised its reserved police power "to meet a purely local condition" in enacting its cab curtain law as a health measure, that the boiler inspection act is "an inspection act and nothing else," it and the safety appliance laws are so general in their provisions that they cannot be held exclusive beyond special matters expressly covered by them and neither they or any rules promulgated by their authority deal with the subject of cab curtains.

Cold weather, heavy snow falls and drifting snow which at times during the winter interfere with efficient operation of railroads are not purely a local condition or concern of northern Michigan. Like conditions prevail throughout the northern portion of the northern States from Maine to beyond the Rocky mountains. The deep snows and fierce, drifting blizzards of the northern prairie States are matters of common knowledge. An old engineman of plaintiff familiar with all parts of its system testified that Wyoming "is the hardest territory we have got, to handle during the winter time." Heavy snow falls and drifting winter winds are far from a purely local condition confined to northern Michigan. The scope of like seasonal occurrences of such conditions in our northern States naturally touches and materially affects interstate commerce. If each State where such conditions prevail was free to separately dictate how locomotives within its borders engaged in interstate

commerce should be equipped to meet such conditions, the various appurtenances which their conflicting legislation might in combination impose could lay a heavy additional burden on such commerce.

It is urged that the rules of interstate commerce are confined to uniformity throughout the country, and its various climatic conditions do not permit such a rule. A rule of uniformity may rest upon a reasonable classification, making it applicable to kindred conditions or circumstances as in the rate cases, and, more closely analogous, special rules promulgated under this law relative to locomotives using coal oil for fuel.

We do not find or think that any court has held the boiler inspection law purely an inspection act and nothing more. It primarily and specifically provides for an inspection. But if those authorized to administer it could only inspect and nothing more it would be a purposeless, vain, and toothless law. Its original title, however, states its purpose is to promote the safety of employees and travelers by *compelling* interstate commerce common carriers to equip their locomotives with safe and suitable boilers and appurtenances to that end. By the amendment it was made certain that the law covered "the entire locomotive and tender and all their parts," which the carrier was compelled to equip with safe and suitable appurtenances. For execution of that purpose many rules have been promulgated and enforced by the interstate commerce commission under authority of this act, dictating the nature and use of various appurtenances and kinds of equipment. We are not aware that any court has denied its power to do so.

The fact that the interstate commerce commission promulgated no rule relative to cab curtains is not the test of whether congress had occupied the field. Plaintiff and some other, if not all, railroads similarly situated with lines in the northern zone of deep snows

had adopted cab curtains as regular appurtenances for locomotives operated in those regions long before the boiler inspection act was passed. By the amendment of 1915, if not before, it became the duty of inspectors appointed under that act to inspect all parts and appurtenances of locomotives and tenders engaged in interstate commerce. Presumptively they did so and found no fault. It is not, however, a question of what they did but of what they were required by the law to do and should have done. The title of the Michigan act provides "Either cab curtains, vestibule cabs, housings, and other devices," are to be prescribed for "the safety and health of railroad employees" and repeats such requirements in the body of the act as applied to locomotive enginemen. The purpose of the Federal act as expressed in its title is to compel carriers of interstate commerce by rail to equip their locomotives with safe and suitable appurtenances "to promote the safety of employees and travelers." Both are, comprehensively viewed, directed to an analogous purpose. The use of the word "health" in the State act as applied to cab curtains, vestibule cabs, etc., cannot circumscribe the more comprehensive word "safety" as applied to the "entire locomotive and tender and all their parts."

In *Whish* v. *Public Service Commission*, 205 N. Y. App. Div. 756 (200 N. Y. Supp. 282), where the court held a New York law requiring vestibule cabs and locomotives for protection of enginemen in winter invaded the field occupied by Federal authority under the amended boiler inspection law, the opinion ably discusses the questions raised here in part as follows:

"In the case under consideration congress has not provided in its statute for any rule of universal application, but has distinctly provided that each carrier shall file with the commission its proposed rules and instructions, which are subject to the approval and

modification of the commission.   The mere fact that the commission has adopted a set of rules applicable generally, through the concerted recommendations of the carrier as a matter of convenience, does not mean that the commission cannot adopt a vestibule cab for the carriers operating in States where the rigors of the climate might demand it.   The act of congress clearly indicates the contrary.   The main underlying principle seems to have been conclusively settled since the early decisions of the United States Supreme court.   Where congress takes the field, it operates to supersede any State legislative action, or to prevent any such legislative action upon the same subject. If it depends upon the intent of congress as urged to determine whether or not congress has taken the field, we find that here the plain intent of congress has been to act in the field by requiring the interstate commerce commission to make such regulations as it deems proper with reference to the entire locomotive and tender and all their parts."

The above case, as also *Atlantic Coast Line R. Co.* v. *Napier, supra,* and *Louisville, etc., R. Co.* v. *State,* 16 Ala. App. 199 (76 South. 505), deal exhaustively with the scope of the amended boiler inspection act, are directly in point here and convincingly reasoned, in harmony with the principles controlling this case as we conclude.

A decree should be prepared enjoining the application of the State statute to plaintiff's locomotives and tenders engaged in interstate commerce, as prayed, with costs to plaintiff.

BIRD, C. J., and FELLOWS and WIEST, JJ., concurred with STEERE, J.

SHARPE, J.   (The italics throughout this opinion are mine.)

The State act (Act No. 139, Pub. Acts 1921 [Comp. Laws Supp. 1922, § 8396 (24)]), providing for the equipment of locomotives with either cab curtains or

vestibule cabs, is a police regulation, designed to promote the health and comfort of the employees working therein.     It incidentally affects interstate commerce.

"But when the local police regulation has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, provided it does not conflict with legislation enacted by congress pursuant to its constitutional authority."     *Savage* v. *Jones*, 225 U. S. 501, 525 (32 Sup. Ct. 715).

The question here presented, then, is: Does this statute and the order promulgated pursuant thereto invade a field already occupied by congressional legislation?     Or, as stated by Mr. Justice Harlan in *Missouri, etc., R. Co.* v. *Haber*, 169 U. S. 613 (18 Sup. Ct. 488):

"May not these statutory provisions stand without obstructing or embarrassing the execution of the act of congress?     This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of congress passed in the execution of a clear power under the Constitution, *unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together.*"

There can be no division of the field of occupation. To prevent State legislation there must be such legislation by congress "upon the precise subject-matter" (*Gulf, etc., R. Co.* v. *Hefley*, 158 U. S. 98, 104 [15 Sup. Ct. 802]) as results in an exclusive occupation of the field.     See, also, *Atlantic Coast Line* v. *Georgia*, 234 U. S. 280 (34 Sup. Ct. 829) ; *Pennsylvania R. Co.* v. *Public Service Commission*, 250 U. S. 566, 569 (40 Sup. Ct. 36).     We must examine the provisions of the several acts of congress to determine the ques-

tion.  The first of these was enacted on March 2, 1893 (27 U. S. Stat. p. 531), and is entitled:

"An act to *promote the safety of employees and travelers* upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes."

The title is suggestive of the provisions of the act. It applies to locomotives as well as to cars, and by an amendment in 1903 (32 U. S. Stat. p. 943) tenders were brought within its provisions.  Amendments were later enacted relating to ash pans, mail cars and the like, the purpose apparently being to bring the entire train and all its equipment within the provisions of the law.

By an act passed in 1910 (36 U. S. Stat. p. 298) the safety appliances designated by the commission were to be standards of the equipment to be used on all cars subject to the provisions of the act.

The "boiler inspection act" was enacted in 1911 (36 U. S. Stat. p. 913).  Its title reads as follows:

"An act to *promote the safety of employees and travelers* upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto."

The gist of this act appears in section 2, which reads as follows:

"From and after the first day of July, nineteen hundred and eleven, it shall be unlawful for any common carrier, its officers or agents, subject to this act to use any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler of said locomotive and appurtenances thereof are in proper condition and *safe to operate* in the service to which the same is put, that the same may be employed in the active service of such carrier in moving

traffic *without unnecessary peril to life or limb,* and all boilers shall be inspected from time to time in accordance with the provisions of this act, and be able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."

Its purpose is apparent. It contains no requirements as to the construction of the boilers, but provides that they must be kept "in proper condition and safe to operate * * * without unnecessary peril to life or limb." The sections following provide for the appointment of inspectors, charged with the duty of seeing to it that this provision is complied with.

We next come to the act of 1915 (38 U. S. Stat. p. 1192), amending that of 1911 by adding to section 2 a provision that the inspectors shall have the same powers and duties with respect to all parts of the locomotives and tenders as are conferred by the act with respect to boilers and their appurtenances.

The claim of invalidity of the State statute rests upon the assertion that under this amendment the interstate commerce commission may adopt a regulation providing for cab curtains on locomotives and, if empowered by the act so to do, the field of regulation in that respect is already occupied by Federal legislation and the State left without authority to legislate in reference thereto.

Does this amendment, when read in connection with the act itself and the several acts which preceded it, evince an intention on the part of congress to empower the commission to provide by regulation for curtains on the cabs of locomotives? Or, as suggested by the trial court, "Can it be said that an appliance, primarily devised to protect the health of employees, is an appliance 'to promote the safety of employees and travelers?'" Such a requirement can have but one purpose—to protect the health and provide for the

comfort of the employees while in the cabs of the locomotives. Unless means be provided for excluding the snow from the cabs, large quantities will enter during the storms and blizzards, which are not infrequent in the northern part of this State. It collects upon the clothing of the engineers and firemen, as well as upon the floor and other parts of the cab. The heat causes it to melt, and steam arises therefrom. The clothing of the men becomes dampened, and, when they alight from the cab, it frequently becomes more or less frozen.

The several provisions in the act of 1893 and the amendments thereto were designed to promote the safety of persons and property in transportation, and to protect the lives and limbs of the trainmen. Under the boiler inspection act the commission is charged with the duty to see to it that the boiler and appurtenances thereof—

"are in proper condition and *safe to operate* in the service to which the same is put, that the same may be employed  *  *  *  *without unnecessary peril to life or limb.*"

The amendment of 1915 extends this duty to "the entire locomotive and tender and all their parts." The purpose of this amendment, it seems to me, was to secure the same degree of safety in the operation of the locomotive and tender that was provided for in the act in the operation of the boiler. I can see no intimation in it of an intent to protect the health of the men employed in operating the locomotive. The several regulations referred to and quoted by Mr. Justice STEERE are not, in my opinion, health regulations. Many of them doubtless are conveniences and aids to the enginemen in the performance of their duties. Their efficiency is increased, and not only their personal safety but the safety of the passengers or freight carried on the trains is promoted thereby.

In *Second Employers' Liability Cases*, 223 U. S. 1, 47 (32 Sup. Ct. 169, 38 L. R. A. [N. S.] 44), it was said:

"The duties of common carriers in respect of the safety of their employees, while both are engaged in commerce among the States,   *   *   *   have a real or substantial relation to such commerce."

It may well be asked, Does any such duty devolve upon the carriers in respect to the health or comfort of their employees?

In my opinion, the words "health" and "safety," as used in these acts, are not synonymous terms. "Health" is defined by Webster as "The state of being hale, sound, or whole, in body, mind, or soul; especially, the state of being free from physical disease or pain," and "safety" as "freedom from danger or hazard; exemption from hurt, injury, or loss."

While some of the safety provisions of the Federal acts may tend to protect the health of the employees, such protection is but incidental to the main purpose, that of safeguarding the lives and limbs of the employees and protecting that which is being transported, be it passengers or freight.    The Federal statutes are spoken of in all the cases in which they are referred to as "safety appliance acts."    The State law, if given effect, in no way interferes with the provisions of the safety appliance acts, or the boiler inspection act, or the regulations adopted by the commission pursuant thereto.    Mr. Justice Hughes, in *Savage* v. *Jones*, *supra*, at page 533, said:

"When the question is whether a Federal act overrides a State law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed.    If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be re-

fused their natural effect—the State law must yield to the regulation of congress within the sphere of its delegated power."

He further said:

"But *the intent to supersede* the exercise by the State of its police power as to matters not covered by the Federal legislation *is not to be inferred* from the mere fact that congress has seen fit to circumscribe its regulation and to occupy a limited field.   In other words, such intent is not to be implied unless the act of congress fairly interpreted is in actual conflict with the law of the State.   This principle has had abundant illustration."

In *Sinnot* v. *Davenport,* 22 How. (U. S.) 227, 243, it was said:

"In the application of this principle of supremacy of an act of congress in a case where the State law is but the exercise of a reserved power, *the repugnance or conflict should be direct and positive,* so that the two acts could not be reconciled or consistently stand together."

The rule thus stated was quoted with approval by Mr. Justice Harlan in *Reid* v. *Colorado,* 187 U. S. 137, 148 (23 Sup. Ct. 92), in which it was also said:

"It should never be held that congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested."

The duty of enforcing the several provisions of the Federal acts is cast on the interstate commerce commission.   Its members have had long experience in construing and enforcing acts of congress dealing with interstate commerce.   The record discloses that a blue print showing the proposed requirement was submitted to that commission and the following reply received from one of its members:

"The application of cab curtains and handholds in accordance with blue print submitted with your letter of October 25, 1922, does not conflict with the safety appliance laws, the locomotive inspection laws, or the rules and instructions issued by this commission pursuant thereto."

Any construction placed by the commission or any of its members on the acts of congress would be in no way binding upon the courts, but it is persuasive that in the opinion of the commission the order in question in no way interferes with any regulation made by it under the authority conferred by said acts, and that the Federal acts and the State act may be enforced without conflict.

A similar order to that here considered was promulgated by the commission of Wisconsin and its validity sustained by the supreme court of that State in *Chicago, etc., R. Co.* v. *Railroad Commission* (Wis.), 205 N. W. 932. The questions here presented are discussed at length by Mr. Justice Owen, in an opinion in which the entire bench concurred. The opinion is so readily accessible that I refrain from quoting from it.

The decision in *Whish* v. *Public Service Commission,* 205 N. Y. App. Div. 756 (200 N. Y. Supp. 282), is based upon the assumption that the 1915 amendment to the boiler inspection act conferred upon the interstate commerce commission the exclusive power to provide the nature and kind of appurtenances which should be used on the cabs of locomotives. The distinction between requirements affecting the health of the employees and those providing for their safety and the safety of the persons or property on the train received but little, if any, consideration. And yet it quotes approvingly from *Southern R. Co.* v. *Railroad Commission,* 236 U. S. 439, 446 (35 Sup. Ct. 304), wherein it was pointed out that such appliances were

provided for in the Federal acts "in order to secure the safety of employees."

In *Louisville, etc., R. Co.* v. *State,* 16 Ala. App. 199 (76 South. 505), the State law which was attacked provided that a particular kind of headlight should be used on trains.   This was a safety regulation, pure and simple, and clearly within the Federal statute.

It is also urged that the equipment required by the order is unnecessary and expensive and "an unwarranted attempted exercise of police power."   The record in this case, and in the Wisconsin case, *supra,* discloses that several of the railroads affected by these orders have complied with their provisions.   I am not impressed that the commission abused the power conferred on it by the act in the requirements provided for.   In view of the length of this opinion, I adopt the reasoning of the Wisconsin court in this respect.

The Wisconsin order did not provide for the housing over the tank as their statute did not authorize it. While the evidence is somewhat conflicting as to its use, the fact that several roads have installed it, and are using it without seeming interference with the operation of their locomotives, impels me to conclude that we should not interfere with the order made in that respect.

Acts of our State legislature "are to be presumed constitutional until the contrary is shown."   *Sears* v. *Cottrell,* 5 Mich. 259; *Cummings* v. *Garner,* 213 Mich. 408; *Moore* v. *Harrison,* 224 Mich. 512.   Any rational doubt which exists as to the constitutionality of a law must be resolved in favor of its validity. *Bowman* v. *Wayne Circuit Judge,* 214 Mich. 518, 528.

In my opinion, the act and the order of the commission promulgated pursuant thereto should be held to be valid as a proper exercise of the police power of

the State. The decree rendered by the trial court will be affirmed, with costs to defendant.

SNOW,[1] CLARK, and McDONALD, JJ., concurred with SHARPE, J.

Justice MOORE took no part in this decision.

---

[1] SNOW, J., took part in this decision by consent of counsel.